STATE OF NORTH CAROLINA v. GEORGE MARECEK, Defendant

No. COA01-542

(Filed 3 September 2002)

## 1. Constitutional Law— due process—right to prepare defense—motion for continuance

The trial court in a second-degree murder case did not violate defendant's due process rights to present favorable evidence, to prepare a defense, and to introduce potentially exculpatory evidence, nor did it violate his right to effective assistance of counsel, by denying defendant's motions for a continuance, because: (1) in regard to defendant's expert on homicidal drowning reenactment who had not completed his study and report and who would not be available to testify at trial, defendant's affidavit did not lead to a belief reasonably grounded on known facts that material evidence would be obtained if the continuance was granted; and (2) in regard to the potentially exculpatory witness who allegedly confessed to this crime, defendant did not provide a confession to the court, an affidavit in support of his motion, or any form of detailed proof indicating how he obtained the information.

## 2. Evidence— hearsay—state of mind exception

The trial court did not err in a second-degree murder case by failing to exclude certain testimony of three witnesses, concerning statements made by the victim about her suspicions that her husband was having an affair, on the grounds of alleged inadmissible hearsay statements, because: (1) the statements testified to by two of the witnesses are admissible under the state of mind exception of N.C.G.S. § 8C-1, Rule 803 since the statements include both fact and emotion; and (2) the other witness's testimony was not hearsay since the witness was testifying about her own statements that she made to the victim.

## 3. Criminal Law— jury instruction—implied admissions

The trial court did not err in a second-degree murder case by giving an instruction on implied admissions based on a witness's testimony that he stated to defendant that the witness knew defendant killed his wife, because defendant's reported failure to deny that he killed his wife, along with his incriminating statements, manifest circumstantially

his assent to the truth of the witness's statement that defendant killed his wife.

## 4. Evidence— credibility—failure to allow testimony—no prejudicial error

Although the trial court erred in a second-degree murder case by preventing defendant from offering opinion testimony from two witnesses as to defendant's reputation for truthfulness to bolster defendant's credibility, the error does not warrant a new trial because defendant has failed to carry his burden to show that, absent this error, a different result would have been reached at trial.

## 5. Evidence— defendant owned club or nightstick—relevancy

The trial court did not abuse its discretion in a second-degree murder case by overruling defendant's objections to evidence that he owned a club or nightstick, because: (1) the witnesses' testimony that defendant, as recently as a month before the murder, kept a nightstick in his car is relevant to the State's theory that defendant inflicted the blunt-force injuries of his wife, and then caused her to drown; and (2) the evidence regarding defendant's possession of a nightstick supported the State's theory that defendant injured his wife with a blunt object and then caused her to drown.

## 6. Sentencing— statutory mitigating factor—lacked criminal convictions

The trial court did not err in a second-degree murder case by failing to find the statutory mitigating factor under N.C.G.S. § 15A-1340.4(a)(2)(a) that defendant lacked any criminal convictions, because defendant did not present any direct evidence regarding his criminal record.

## 7. Sentencing— aggravating factor—took advantage of position of trust or confidence

The trial court erred in a second-degree murder case by sentencing defendant in excess of the presumptive range based on the finding of the aggravating factor under N.C.G.S. § 15A-1340.4(a)(1)(n) that defendant took advantage of a position of trust or confidence, because there was no evidence showing that defendant exploited his wife's trust in order to kill her.

STATE v. MARECEK

[152 N.C. App. 479 (2002)]

Appeal by defendant from judgment entered 19 July 2000 by Judge Ernest B. Fullwood in New Hanover County Superior Court. Heard in the Court of Appeals 15 April 2002.

*Attorney General Roy Cooper, by Assistant Attorney General Steven F. Bryant, for the State.*

*Rudolf Maher Widenhouse & Fialko, by M. Gordon Widenhouse, Jr., for defendant-appellant.*

HUDSON, Judge.

Defendant appeals his conviction and sentence for second-degree murder. For the reasons given below, we find no prejudicial error in the guilt-innocence phase of the trial, but we remand for resentencing.

In 1991, defendant George Marecek, retired after serving thirty-six years in the Special Forces at Fort Bragg, lived with his wife, Viparet Seawong Marecek (variously referred to as "Viparet" or "Viparat"), in Fayetteville. During their vacation at Fort Fisher in May and June of 1991, Viparet was beaten with an unidentified blunt object and drowned. Defendant was indicted for the first-degree murder of his wife on 10 January 1994.

Defendant was first tried in 1995, but the jury deadlocked, and the court declared a mistrial. *See State v. Marecek*, 130 N.C. App. 303, 304, 502 S.E.2d 634, 634 (hereinafter, *Marecek I*), *disc. review denied*, 349 N.C. 532, 526 S.E.2d 473 (1998). A second jury trial began on 27 January 1997, and concluded with defendant's conviction of second-degree murder. *See id.*, 502 S.E.2d at 635. Defendant appealed to this Court, which reversed and remanded for a new trial. *See id.* at 308, 502 S.E.2d at 637.

A third jury trial was held beginning on 10 July 2000. At this trial, the State presented evidence tending to show that defendant bought a life insurance policy on his wife in January of 1991, in the amount of $150,000, with an accidental death rider paying an additional $150,000. Richard and Susan McCall, who stayed with the Mareceks for two or three weeks during the spring of 1991, testified that there was much tension between defendant and Viparet, in contrast to the way their relationship had been earlier in their marriage.

The State presented evidence from which one could infer that defendant was involved with a woman in the Czech Republic. State's Exhibit 30 consisted of an excerpt from a letter written by defendant

in the Czech language to an unknown person and signed by "Jirka," which is a diminutive form of the Czech name that translates to "George." Hana Kucerova, who translated the letter from Czech into English, read her translation to the jury. She read, in pertinent part, the following:

> "The ultimate thing for me now is to arrange for us to be together." Square bracket, translator's note: punctuation mark is missing, square bracket. "The plan is ready. I only need time and your help with it, for you to be good, to learn English and to take care of yourself. Everything else I will do myself.
>
> . . . .
>
> "Darling, have that new translation done immediately and send a copy. How was that trip to Decin [a city in the Czech Republic]? Is the car all right? Now you can sit down and answer my questions. I keep thinking of you all the time and I wish I were together with you over there, but it will be soon. Trust me. I have to rush. I am sending you a kiss and I love you terribly.
>
> "See you soon. Yours faithful to you, Jirka."

Susan Kirk, defendant's daughter, testified that defendant made three trips to Czechoslovakia during the summer and fall of 1990. Viparet began to call Kirk with increasing frequency while defendant was in Czechoslovakia. After defendant's trips to Czechoslovakia, while defendant and Viparet were visiting Kirk, defendant showed slides he took while in Czechoslovakia. There were several of defendant and Hana Marecek, in which defendant and Hana were standing next to each other and/or touching. Viparet elbowed Kirk each time defendant showed a picture of himself next to Hana. Kirk told Viparet not to be concerned that defendant might be having an affair with Hana Marecek because Hana was defendant's cousin.

Viparet had discovered some letters that she thought indicated her husband was having an affair with a woman in Czechoslovakia. She sought to have the letters translated by a woman who taught Czechoslovakian at the Special Forces school in Fort Bragg. The teacher's husband, Russell Preston (a friend of defendant), called defendant and told him on the telephone, in Czech, that Viparet wanted the letters translated because she wanted to use them in a divorce proceeding. Defendant asked Preston to get the letters for him, but Preston was unable to do so. Preston called Viparet and asked her for the letters, but Viparet said "No, no, don't call me here."

Inge Shaw, a friend of Viparet's who lived in the Mareceks' neighborhood, told Preston "to be very careful, that you don't want to get her in any trouble, she's very scared about this." Preston told defendant that he was unable to get the letters and that Shaw told him to be careful, and defendant replied, "I'll take care of it. . . . F-ing bitch, I'm getting tired of her crap."

Richard McCall testified that while he was staying with the Mareceks in the spring of 1991, he and Viparet discussed the Mareceks' upcoming trip to Fort Fisher, and Viparet indicated that she did not want to go. The day before defendant and Viparet left for Fort Fisher, Viparet told her friend, Inge Shaw, that she was afraid she might not return. Shaw's additional statements are discussed in our analysis of the hearsay issues raised by defendant.

Defendant and Viparet arrived at Fort Fisher on Friday, 31 May 1991. Around 6:00 p.m., on either Friday or Saturday, defendant, accompanied by Viparet, approached Anthony Rackley and asked if he knew of a secluded fishing spot. Rackley directed him to Davis Beach, which could be reached by taking Fort Fisher Boulevard to Davis Road. Rackely told defendant that at the end of Davis Road, "the pavement ends and you get out of your car and you've got an open little beach way there with trails." On Sunday morning, 2 June 1991, vacationer Carola Treu was on the pier fishing when defendant approached her and introduced himself and Viparet. He referred to Viparet as "his little girl." Defendant told Treu that they were on vacation and looking for a better fishing spot. Viparet stood silent with her head down.

At about 4:00 p.m. on Monday, 3 June 1991, Dennis Rood, an electrician at Fort Fisher, passed two pedestrians as he drove east on Fort Fisher Boulevard at about five miles per hour. He identified the two people as defendant and Viparet, and stated that they were walking west, towards the river. He described Viparet as wearing a reddish-colored blouse with shorts, and stated that one of them was carrying beach equipment. At about the same time on the same day, Tom and Beth Deleuw were driving past the Fort Fisher recreation area when they saw a white man and an "Oriental woman" crossing the road, carrying beach items, and looking like they were either coming from or going to the beach. Mr. Deleuw remembered that he said to Beth, "Look, there's a retired air force colonel and his pie-faced wife."

James Davis, a deputy with the New Hanover County Sheriff's Department, took a missing person's report from defendant at about

8:00 p.m. on that evening, 3 June 1991. Defendant told Deputy Davis that when he left for the beach at about 12:35 that afternoon, his wife was at the cottage. She planned to do laundry at the cottage and then check on a fishing spot for the next day. Defendant said that when he returned to the cottage, she was not there, and he began to worry after 5:00 when she had not returned. By the time Deputy Davis left the cottage, it was getting dark. He instructed defendant to leave the lights on and to leave a note on the front door if he left, so that Deputy Davis could find him in case he found defendant's wife. Deputy Davis then conducted a search, including the Davis Beach area, but found nothing. Deputy Davis passed defendant's cottage ten or twelve times during the course of the evening, and he noticed that the porch light was off and defendant's vehicle never moved. He checked for a note each time, but did not see one.

Carola Treu testified that she saw defendant at about 7:00 p.m. that evening. She and her mother were on the pier and he showed them his wife's driver's license and asked if they had seen her. Defendant told them that his wife left at 3:00 to find a fishing place and he stayed home to do laundry. She was supposed to be home at 5:00 and was now two hours late. Defendant told Treu and her mother that Viparet left the cottage without her handbag, money, or jewelry.

Treu and her mother saw defendant again on Tuesday, 4 June 1991, around noon. Treu testified that defendant "looked good," so she asked him if his wife had turned up. She testified that "then he turned, his face turned, and he said, 'Oh, no, she still didn't turn up, and I was running around, looking for her all the time, and now I have to go home and change clothes to get long pants because mosquitos bite me up all over the place, and then I start again looking for her.' "

On Tuesday, 4 June 1991, Detective George Landy of the New Hanover County Sheriff's Department, accompanied by Major Lanier and Detective Bill Simmons, went to defendant's cottage to gather information about Viparet. Defendant was in the process of completing a handwritten summary of events. Detective Landy read defendant's statement into the record, as follows:

THE WITNESS: To whom it may concern: I, Colonel George Marecek—in parentheses NMI, meaning no middle initial—and my wife, Viparat Marecek, arrived here at Fort Fisher on Friday, 31 May 1991, for a one-week vacation that we have planned since February, 1991. Our daily schedule generally followed this routine: 6:00, four-mile morning run, light breakfast, 8:30 hours a.m.

beach until 1430 p.m., showers, washing of beach towels and other items, preparing evening meal, and a short walk after dinner, one hour, watch evening news, local and international, select a short program of mutual interest and then retire for the night.

On 3 June, 1991, the day started just like all others, with the following differences: Viparat and I returned from the beach at 12:35 p.m., Viparat prepared a fresh salad and a small portion of low fat cottage cheese and we watched the noon news and a soap opera—in parentheses it says the word "Loving"—and a portion of—again in parentheses, "All My Children." I suggested to Viparat that we return to the beach for a couple, three hours, but she told me to go by myself, that she has plenty of sun for now and she will wash all the towels and other items and, if she finish early, she may go and look for a good place to go fishing tomorrow.

Also, she mentioned she would stop at the pier, and if she is up to go swimming, she will go to the base pool. She told me to be home by 1700 hours and if she is not here to remove the chicken from the refrigerator, remove the skin and prepare them for dinner and that she would be home shortly after. We exchanged greetings and I left for the beach approximately 2:30 p.m. and returned back at 4:55 p.m. Viparat was not at home, but she washed all towels and other items and neatly folded them up and stored them in the cabinets.

I showered and washed the towel I used when I noticed that there is a heavy rain outside. I looked at the watch; it was 5:20 p.m. I was concerned at this time, for the first time, about her absence and also considered to go with the car and look for her so she would not get wet. However, I decided to wait and give her some more time. Shortly, the rain stopped, and when she failed to return, I left the house and started to look for her. I looked everywhere, on base, off base, on the beach, with the reception center, talked to neighbors, other families staying in Fort Fisher. No luck, no one seen her. I went to the local police station, but nobody was there. I continued to look for her and, at 8:10 p.m., I called 911 from the reception center and requested assistance from the sheriff's department.

While I was waiting for his arrival, Officer McDonald from the local police station arrived, obtained the necessary information on my wife Viparat and departed to see if he could locate her. He

STATE v. MARECEK

[152 N.C. App. 479 (2002)]

informed me that a sheriff will arrive shortly and will assist me. Shortly after McDonald departed, approximately 15 minutes, Sheriff Davis arrived and obtained all the necessary information on my wife and myself, completed a police form which I signed, and requested a picture of Viparat for identification. I gave him her North Carolina driver's license, since that is the only picture I have of Viparat here. He departed, informing me that he or the police officer will keep me informed.

I continued to look for Viparat until 11:35 p.m., at which time I decided to organize a search plan for the following day, June 4th, 1991, the way I think Viparat would go looking for a new fishing place. I started early morning, checking the area left of the Fort Fisher pier. No luck in finding anything. Was hoping to get a national guard helicopter, but no luck.

As soon as I finished that area, I noticed a sand bar area in a greater distance and decided that, after checking the immediate area around the snack bar, I would find a way there. Walking through the picnic area, I realized that the big dirt road may lead into the general area. I left for home, changed my clothing into something more protecting against the elements and started out with a search of the area right of the Fort Fisher pier.

Prior of actually starting, I got my bearings from the Fort Fisher pier, when I noticed a person actually standing on the sand bar. This gave me more psychological motivation to drive on, thinking Viparat may have seen the same a day earlier. I followed the road until I reached a blacktop road on which I turned left and followed it until the river. A good area, much used for fishing and camping. When I entered the sand area, I noticed the person again on the sand bar at a greater distance, wearing a hat—or excuse me, wearing what looked like a dark blue jacket, with a beard, and it looked like he was fishing, but I am not sure. The important thing for me was that if he can stand there, I can follow the edge and check the area. I zigzagged back and forth on the river edge, losing site [sic] of the person.

After a short time, I spotted something different, something that did not blend with the nature, it was my Viparat. The rest is very difficult to articulate in words. My subconscious mind must have taken control, and many things happened at once. I had no control over myself. I felt anger, outrage, hate. I took the shortest way back to Fort Fisher to call the authorities. I cannot com-

plete—I cannot completely account for what happened during my run back or what actually happened when I arrived there.

Q And is there anything else? You mentioned a notation or a map on that document, is that correct?

A Yes, there is some writing back here, some names that he was giving us to contact, and plus an outline of the drawing of the river along Fort Fisher and the dirt trail from the actual air base over to Davis Road and down to the river.

Dennis Rood testified that on 4 June 1991, he entered the general store at Fort Fisher and saw defendant on the floor "hollering, 'I found her, I found her.' " Rood helped him up and asked where she was; defendant indicated down the dirt road toward Davis Beach. Rood and another man went down that road in a golf cart and walked through the wooded area but did not find anything.

Henry Beeker, the public works director for the town of Kure Beach, testified that around lunchtime on 4 June 1991, he and the Kure Beach Police Chief, Troy Hamilton, responded to a radio call that there had been a possible drowning at Fort Fisher. They arrived at the general store to find defendant on his hands and knees on the floor, "in pretty bad shape." They helped defendant into the police car and told him to direct them to the body. Following defendant's directions, Chief Hamilton drove the police car to the end of Davis Beach Road. Defendant appeared disoriented and was unable, at first, to tell the men where his wife's body was. Then defendant indicated the direction, and the men found her. She was in the marsh grass, in the water, face down and naked.

Detective Larry Hines of the New Hanover County Sheriff's Department arrived at the Davis Beach area a few minutes after 1:00 p.m. on 4 June 1991. He testified that it took three or four people to turn the body over. After the body was turned over, Detective Hines noticed injury to the lip and eye areas and some marking or bruising in the neck area. After the medical examiner left with the body, Detective Hines searched the area and found several paths, including one that came out close to where the body was found. He saw "quite a few" shoeprints in the area, but due to the sandy nature of the area, was not able to identify the prints, except to say that they were "tennis shoe type."

Later that afternoon, Detective Hines and Detective Simmons spoke with defendant. Detective Hines testified as follows:

Q  And what did [defendant] tell you at that time?

A  He was mainly speaking to Detective Simmons, but I was in the conversation and heard. He explained that him and his wife had had lunch that day; that after lunch, approximately, I think 2:30, they had watched part of a soap opera. I think he described it as All My Children. He made the determination he was going back to the beach. She was going to stay behind and do some laundry, and she may go look for a place they may could go fishing. They agreed to meet back at the cottage around 5:00. He says when he got back from the beach, she wasn't there, he got worried and started looking for her, and he actually contacted the sheriff's department and filed a report.

Q  Okay.

A  And then he said he continued looking that night. He said the next day, he got up in the morning, went jogging. He said that was a ritual for him and Viparat, they both would go jogging. He got up that morning by his self and went jogging. After that, he came back and proceeded to look and search the base area for Viparat. At one point, he made it to the boat ramp, to the pier. He said he got out on the pier and tried to put his mind into the mind of Viparat and where would she go looking for a place to fish. He said he observed a white male with a beard, wearing a blue suit, standing in the area north of that pier, and it appeared to him this guy was fishing. So he figured that if that guy could get there and fish, then maybe Viparat thought she could get there and fish.

So he proceeded to that area and, when he got there, the man was not there, but that he observed his wife's body floating in the water; that she was face down; that he approached the body, attempted to turn her over and couldn't, or turn her neck, but then he turned the body over, saw bubbles coming out of her mouth; that he reached down and kissed here, and then he said he lost it and just went running back to the base.

Roger Hayes testified that on 4 June 1991, he and his uncle went to the beach at the end of Davis Beach Road so that he could fish while his uncle lay out in the sun. They arrived at the beach in mid-morning and stayed all afternoon, until the police arrived. Hayes testified that while he and his uncle were on the beach, Hayes saw only one other person: a man on the opposite side of the beach, who had

dark facial hair and was wearing something like a jumpsuit and blue boots. Hayes saw the man walk down to the water, turn and look at Hayes, and then walk back into the woods. This man, who was not identified, never stepped or reached into the water. About fifteen or twenty minutes later, officers came to the beach and asked Hayes if he had seen a woman. Hayes testified that he did not see defendant or anyone else walk down Davis Beach toward where the body was found.

Dr. Robert Thompson performed the autopsy on the body. He testified that the body had begun to deteriorate slightly, and "[t]here were tissue defects in the earlobes above the left eye and the left side of the lower lip. These were consistent as having been made by marine animals after having been in the water for a period of time." He testified that there were blunt-force injuries to the head, which would not have been fatal but which may have caused the victim to lose consciousness. There were also several defensive wounds on the victim's arms and hands. The cause of death was drowning, to which the head injuries would have contributed. Dr. Thompson found no evidence of sexual assault and was unable to determine the time of death.

Several witnesses testified that defendant had owned what was described as a billy club, blackjack, or nightstick, that he kept in his car.

On 7 June 1991, Detective Landry went to defendant's home in Fayetteville for the purpose of recovering some letters hidden in the victim's sewing machine. Defendant had given permission to search his residence, and Detective Landry retrieved letters and documents written in a foreign language.

On Thursday, 6 June 1991, Susan Kirk, defendant's daughter, drove to Fort Fisher to be with her father, after she learned Viparet was dead. The next morning, she accompanied defendant to the funeral home to pick up the box of Viparet's cremated remains. Kirk testified that defendant patted the box of remains and said, "Now I have control of my little girl." While they were driving from the funeral home to the police station, defendant told Kirk about the life insurance policy he had on Viparet, that he would collect $300,000 due to the accidental death clause, and that he intended to spend it on various family members. Defendant did not want to have a memorial service for Viparet, but Kirk insisted.

The State introduced into evidence a marriage certificate containing the names George Marecek and Hana Marecekova dated 12 July 1992. Kirk testified that Hana Marecekova is defendant's cousin.

Defendant presented evidence tending to show that he and Viparet had a good relationship. Rose Flynn, a neighbor who met defendant in the spring of 1991 in her capacity as a real estate broker, testified that she attended a meeting at which the Mareceks were present. The meeting turned into "a little social thing," where everyone made small talk, which "was very pleasant, friendly." Her husband, Phillip Flynn, testified that several times when he saw Viparet working in the yard, he stopped and talked with her for a few minutes. There was one occasion in the spring of 1991 when he spent some time with the Mareceks, and he noticed nothing unusual.

Gunther Monteadora testified that he knew defendant through a social club that met regularly on Saturday mornings. Occasionally Viparet would attend. Monteadora testified that he never heard the Mareceks speak harshly or angrily towards each other and that he knew of no problems or difficulties between them.

Christopher Cinkoske also attended the social club meetings. When he saw the Mareceks together, they appeared "[c]aring, affectionate glances, occasional touch, chit-chat, things like that, just normal married stuff." On one occasion in March of 1991, Cinkoske went to the Marecek's home to invite defendant to a party. Defendant was not home, so Cinkoske waited and chatted with Viparet. Cinkoske testified that Viparet seemed excited and happy about the plans she and defendant had to add on to the house. Cinkoske talked with Viparet at the party and again on Memorial Day of 1991, when she mentioned that she and defendant were going to go to Europe to bring back "a distant female relation to [defendant], a cousin or something. She was joking around with me, since I was single and not seeing anybody at the time, she was joking around, I might want to meet this single female cousin they were bringing back."

Robert Holman, a neighbor of the Mareceks, testified that he had been invited to the Mareceks' house on two or three occasions. He testified that he was not aware of anything out of the ordinary between defendant and Viparet, nor did he notice any hostility or tension between the two. He testified that he talked to Viparet daily, because she worked in the yard a lot, and he would see her when he came home from work.

STATE v. MARECEK

[152 N.C. App. 479 (2002)]

Alphonso Woodall testified that he had known defendant since 1981, when defendant was Woodall's superior. Woodall and the Mareceks lived in the same neighborhood, and Woodall would see both from time to time. Defense counsel tried to elicit Woodall's opinion as to defendant's reputation in the community for truthfulness and honesty, but the court sustained the State's objection.

Joseph Lupiak testified that he had served with defendant in the Special Forces since the 1950's. Over the years, Lupiak and his wife saw the Mareceks at many social events, and Lupiak often socialized with defendant. Lupiak testified that he was able to observe the Mareceks' relationship, as late as the early part of 1991, and that its was "a very amicable relationship. I seen no hostilities, no problems. They seemed to get along fine. In fact, they seemed to care for each other very much."

Lupiak also described defendant's distinguished military career and his many accomplishments and honors, and testified that defendant was honorably discharged. When the court ruled that evidence of defendant's reputation for truthfulness and honesty could not be presented, defense counsel asked for and was allowed the opportunity to make a proffer of Lupiak's testimony. In response to a question about whether, in his opinion, defendant was law-abiding, Lupiak testified that defendant was "one of those individuals that will do nothing—from what I've seen, that will do nothing that would be—that would hurt his integrity, that would—that would make him look bad. He is one of those exceptional individuals, very law-abiding."

The defense presented several witnesses whose testimony was consistent with defendant's written summary of events on the day of Viparet's death. Counsel for the defense was allowed to read into the record the testimony of two witnesses who were unavailable to testify but had testified at an earlier trial. Thai Truong was visiting Fort Fisher with his foster family on the weekend of the murder. He went to the beach on Sunday, 2 June 1991, and saw defendant and Viparet there. He noticed Viparet because she was "pretty good-looking." Truong testified that he saw defendant and Viparet on the beach in the morning and then again in the afternoon. On Monday morning, 3 June 1991, Truong again saw both defendant and Viparet on the beach. Truong left the beach around noon to have lunch, and when he returned at about 1:30, he saw only defendant on the beach. He remembered that Viparet did not return to the beach in the afternoon, because he joked with his foster mother, Susan Abe, that Oriental women are supposed to make lunch. Truong testified that he stayed

on the beach that afternoon until 5:30 or 6:00 and did not see defendant leave.

Susan Abe, Truong's foster mother, also testified that she saw defendant and Viparet on the beach on Sunday, 2 June 1991. She explained that her attention was drawn to Viparet because she, herself, was of mixed ancestry and liked to guess the backgrounds of other "Oriental[s]." On Monday morning, Abe saw both defendant and Viparet on the beach. Abe testified that only defendant was on the beach on Monday afternoon. She recalled joking about the "proper Oriental wife . . . cleaning up after lunch." Abe also recalled that her husband was jealous because defendant watched her when she went into the water, since his wife was not there. Abe testified that her family left the beach on Monday at around 5:00. She did not see or recall defendant leaving the beach, but acknowledged that "[h]e may have."

David L. Kelly, Jr., who was in the North Carolina National Guard, testified that he was at Fort Fisher for a two-week training period at the time of the murder. Kelly saw defendant and his wife running each morning as he was leaving for his physical training. He also saw Viparet on several afternoons around 3:30 or 4:00, walking towards the river. Kelly testified that on Monday, 3 June 1991, he saw Viparet walking by herself between 3:15 and 3:45. He remembered the time because he had to return to his room to get some things before a 4:00 class.

Richard Ward Tobin also attended the two-week National Guard Training at Fort Fisher. He saw defendant and his wife jogging on the mornings of Saturday, 1 June 1991, and Sunday, 2 June 1991. Tobin testified that on Monday, 3 June 1991, around 4:00 in the afternoon, he saw Viparet alone, leaving the reception center as he was entering. Tobin smoked a pipe on the pier. At approximately 4:25, he saw Viparet again, still alone, in front of the reception area. He was sure of the time because he knew how long his pipe would stay lit.

Brooks Adcox, a banker, testified that in 1991 defendant had $130,000 to $150,000 in liquid assets. These assets consisted of joint bank accounts, to which Viparet had access. After Viparet's death, defendant instructed Adcox to release all his records to the police.

On 19 July 2000, the jury returned a verdict of guilty of second-degree murder. The trial court found as an aggravating factor that defendant took advantage of a position of trust or confidence to commit the offense, and the court found as mitigating factors that defend-

ant was honorably discharged from the military, he had been a person of good character or had a good reputation in his community, and he had an outstanding military career. The court found that the aggravating factor outweighed the mitigating factors and sentenced defendant to thirty years imprisonment. Defendant appeals.

I.

**[1]** On 19 June 2000, defendant moved for a continuance of the trial, which was scheduled to begin on 10 July 2000. He contended, *inter alia*, that his expert on homicidal drowning re-enactment, Walter Hendrick, had not completed his study and report and would not be available to testify at trial. Defendant's motion was accompanied by an affidavit from Hendrick.

After a hearing on the motion, the trial court found that

in reference to the date of this matter, that as early as March of this year this Court advised the lawyers for both parties that the trial of this matter was to be set in June of this year. That subsequently, the Court advised the parties that the Court would set the date on July the 10th of this year. The Court finds that counsel and parties for both parties have known about the date and that in reference to the acquiring of any experts to testify in this matter, it was incumbent upon counsel to make sure that the experts were available at the date that the matter was set for trial. I find that in reference to the defendant's proposed expert, Mr. Hendrick, that it appears that this witness was contacted well after the trial of the case had been set. The Court also finds that the witness has not been subpoenaed for trial.

Finding "no justifiable reason" for a continuance, the court denied the motion.

Although a motion for a continuance "is ordinarily addressed to the sound discretion of the trial judge, and the ruling will not be disturbed absent a showing of abuse of discretion," when the motion "raises a constitutional issue, the trial court's action upon it involves a question of law which is fully reviewable on appeal by examination of the particular circumstances revealed in the record." *State v. Beck*, 346 N.C. 750, 756, 487 S.E.2d 751, 755 (1997); *see State v. Tunstall*, 334 N.C. 320, 328, 432 S.E.2d 331, 336 (1993) ("This Court has long held that when a motion for a continuance is based on a constitutional right, the issue presented is an issue of law and the trial court's conclusions of law are fully reviewable on appeal.").

Defendant argues here that in denying his motion to continue, the trial court violated his constitutional rights. Specifically, he contends that the court denied his due process rights to present favorable evidence, to prepare a defense, and to introduce potentially exculpatory evidence, as well as his right to effective assistance of counsel.

In *Tunstall*, our Supreme Court held that:

> The defendant's rights to the assistance of counsel and to confront witnesses are guaranteed by the Sixth and Fourteenth Amendments to the Constitution of the United States and by sections 19 and 23 of Article I of the Constitution of North Carolina. Implicit in these constitutional provisions is the requirement that an accused have a reasonable time to investigate, prepare and present his defense.

*Tunstall*, 334 N.C. at 328, 432 S.E.2d at 336 (internal quotation marks and citation omitted); *see State v. Walls*, 342 N.C. 1, 25, 463 S.E.2d 738, 748 (1995), *cert. denied sub nom. Walls v. North Carolina*, 517 U.S. 1197, 134 L. Ed. 2d 794 (1996). Thus, a defendant "must be allowed a reasonable time and opportunity to investigate and produce competent evidence, if he can, in defense of the crime with which he stands charged and to confront his accusers with other testimony." *Tunstall*, 334 N.C. at 328, 432 S.E.2d at 336 (internal quotation marks omitted); *see Walls*, 342 N.C. at 25, 463 S.E.2d at 748. " 'However, no set length of time is guaranteed and whether defendant is denied due process must be determined under the circumstances of each case.' " *Walls*, 342 N.C. at 25, 463 S.E.2d at 748 (quoting *State v. McFadden*, 292 N.C. 609, 616, 234 S.E.2d 742, 747 (1977)).

Because defendant here has alleged that the denial of his motion to continue deprived him of his constitutional rights, we review the ruling *de novo. See Beck*, 346 N.C. at 756, 487 S.E.2d at 755. "If defendant demonstrates that the denial of a motion for continuance was erroneous and that the error was a constitutional violation, defendant is entitled to a new trial unless the State shows that the error was harmless beyond a reasonable doubt." *Id.*

Our Supreme Court has stated that:

> Continuances should not be granted unless the reasons for the delay are fully established. "[A] motion for a continuance should be supported by an affidavit showing sufficient grounds for the continuance." *State v. Kuplen*, 316 N.C. 387, 403, 343 S.E.2d 793, 802 (1986). " '[A] postponement is proper if

there is a belief that *material* evidence will come to light and such belief is reasonably grounded on known facts.' " *State v. Tolley*, 290 N.C. 349, 357, 226 S.E.2d 353, 362 (1976) (quoting *State v. Gibson*, 229 N.C. 497, 502, 50 S.E.2d 520, 524 (1948)) (alteration in original).

*Id.*, 487 S.E.2d at 755-56 (citation omitted) (alteration in original). However, "a mere intangible hope that something helpful to a litigant may possibly turn up affords no sufficient basis for delaying a trial to a later term." *State v. Tolley*, 290 N.C. 349, 357, 226 S.E.2d 353, 362 (1976) (internal quotation marks omitted).

The issue here is whether defendant's motion gave rise to a belief, "reasonably grounded on known facts," that "*material* evidence [would] come to light" if the continuance was granted. Hendrick's affidavit provides, in relevant part, as follows:

4. On June 7-8, 2000, a drowning re-enactment was performed by the RIPTIDE homicidal drowning investigation team which was lead [sic] by me.

5. This investigative re-enactment included a study of the Cape Fear River's physical attributes and a review of the Cape Fear River tide conditions at Fort Fisher, North Carolina in order to recreate the conditions as closely as possible to the conditions of the scene of Viparat Marecek's death on June 3, 1991.

6. On approximately June 7, 2000, RIPTIDE placed mannequins in the Cape Fear River to study the movement over time of a body in the water at and near the location where the body of Viparat Marecek was found on June 4, 1991.

7. The drowning re-enactment demonstrated that a body could not have remained in the water for a period of twenty continuous hours at the location where the body of Viparat Marecek was found.

8. The RIPTIDE team also discovered small crustaceans that moved about just at the water's edge where the water met the shore. This is the most likely type of place where the victim was left for at least a period of time greater than a couple of hours. Further investigation of these crustaceans and the type of bite marks they would leave are warranted to prove or disprove this possibility. Knowing where the victim was left for at least a period of time will help provide the necessary information to

determine where Viparat Marecek was left in the water in relationship to where her body was found.

9. Because of my other commitments, I have not yet been able to prepare a report on my findings.

10. Once a report has been prepared, significant additional investigation and study can then be performed by additional experts.

We conclude that defendant failed to meet his burden. The affidavit indicated that Hendrick's study showed the victim's body did not remain at the location where it was found for twenty hours. Hendrick suggests that additional investigation might determine where the victim's body was "left in the water in relationship to where her body was found." While such information could be helpful to the defense, it would not necessarily have been so. Moreover, Hendrick concludes that "significant additional investigation and study" by "additional experts" is necessary. The defense did not identify these additional experts or indicate whether they were available; nor did the defense indicate the nature of the additional investigation and study that was necessary. Thus, the affidavit does not lead to a belief "reasonably grounded on known facts" that material evidence would be obtained if the continuance were granted. *Beck*, 346 N.C. at 756, 487 S.E.2d at 756 (internal quotation marks omitted).

We conclude that the affidavit suggests "a mere intangible hope that something helpful to [defendant] may possibly turn up," *Tolley*, 290 N.C. at 357, 226 S.E.2d at 362 (internal quotation marks omitted), rather than "a belief that *material* evidence will come to light," *Beck*, 346 N.C. at 756, 487 S.E.2d at 756 (internal quotation marks omitted), as is required. Accordingly, the trial court did not err in denying defendant's motion to continue on this basis.

At the conclusion of defendant's evidence, defense counsel again asked for a continuance, this time on the ground that a potentially exculpatory witness was unavailable to testify. Defense counsel addressed the court as follows:

There's another potential witness we are attempting to get. He's a detective from Detroit, who I learned about on Friday as a possible witness, to come and, Your Honor, I've been trying to—I wrote a letter and faxed it to the people in Detroit on Friday, and I've been trying to contact them yesterday and today to see if he can and if he's available to come. He's a detective who is dealing

with obtaining confessions from a serial killer named Eric Armstrong in Detroit. I have reason to believe, but I have not seen the confession, there is a statement in that indicating that perhaps Viparat Marecek may have been his first victim, and I want to bring him here so he can testify about this confession, and I ask for a continuance until tomorrow so I can get this witness here. The reason for not having done this before are two reasons; I didn't know and have information of—and, in fact, I tried to gather further information, including the copy of this confession. I didn't know about this until Friday, and I've been making diligent efforts to get further information from the court and to get him here, but I have not yet been able to do so, and it would be imperative if there really is a confession from another killer that would implicate himself in the murder of Viparat Marecek that he be permitted to testify as to a tremendous possibility of him being the killer.

Defense counsel then stated again that he "still [did] not have the confession to present to this court . . . ." However, counsel stated that:

our information is that . . . the man has stated in a confession that the first killing occurred shortly after his high school graduation, which was in later May of 1991, and he killed a middle-aged Oriental woman on the beach in North Carolina, and he lived in New Bern at the time.

Defendant did not provide an affidavit in support of his motion. *See Beck*, 346 N.C. at 756, 487 S.E.2d at 755 (stating that a motion for a continuance "should be supported by an affidavit showing sufficient grounds for the continuance" (internal quotation marks omitted)). Counsel admitted that he had not seen the confession, and did not indicate how he obtained the information regarding its content. Because "defendant failed to provide any form of detailed proof indicating sufficient grounds for further delay," the motion was properly denied. *Id.*, 487 S.E.2d at 756 (internal quotation marks omitted).

II.

[2] Defendant next argues that the trial court erred in failing to exclude certain testimony of Ingeborg Shaw, Robert Preston, and Susan Kirk, on the ground that this testimony contained inadmissible hearsay statements. Specifically, defendant contends that these witnesses were allowed to testify to statements made by the victim about her suspicions that her husband was having an affair. Defendant

argues that the statements do not fall within the hearsay exception provided in N.C. Rule of Evidence 803(3).

Rule 803 provides:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . .

(3) Then Existing Mental, Emotional, or Physical Condition.—A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

. . . .

N.C. Gen. Stat. § 8C-1, Rule 803 (2001). In *State v. Hardy*, 339 N.C. 207, 228, 451 S.E.2d 600, 612 (1994), our Supreme Court held that statements which "are merely a recitation of facts which describe various events" do not fall within the Rule 803(3) exception. The Court later clarified that statements of fact providing context for expressions of emotion are admissible under *Hardy*. *See State v. Gray*, 347 N.C. 143, 173, 491 S.E.2d 538, 550 (1997), *cert. denied sub nom. Gray v. North Carolina*, 523 U.S. 1031, 140 L. Ed. 2d 486 (1998), *stay allowed*, 354 N.C. 71, 553 S.E.2d 205 (2001), *stay lifted*, 355 N.C. 496, 564 S.E.2d 205 (2002). The Court distinguished the testimony in *Gray* from that in *Hardy* as follows:

Each of the witnesses testified as to the victim's "state of mind," that she was in fear for her life. The factual circumstances surrounding her statements of emotion serve only to demonstrate the basis for the emotions. Each of the witnesses testified that the victim had stated with specific reason and generally that she was scared of the defendant.

*Id.*

Defendant here argues that the testimony in question includes statements allegedly made to the witness by the victim, which merely recite facts and do not describe the victim's state of mind. We disagree.

Shaw, a neighbor and friend of Viparet, testified that Viparet had been at her house the morning before the Mareceks left for the beach. Shaw testified that Viparet was "very upset" when she left, that she was "very sad," and "had tears in her eyes." Shaw testified further that Viparet said "Inge, if I don't come back—promise me this, Inge, if I don't come back from the beach, call the police. Don't let him get away with it." Shaw then testified that she understood "him" to refer to defendant.

Defendant contends that this Court "has already found the admission of these statements constituted reversible error" in the previous appeal. Review of our previous opinion does not bear this out. We summarized the testimony from this witness that we characterized as "mere recitation of fact" as follows:

> Inge Shaw testified that Viparet told her that defendant was having an affair with his cousin, that defendant was spending too much money in Czechoslovakia, including $200.00 on English tapes for his cousin, that defendant didn't kiss her when she made him a birthday cake, and that defendant didn't touch her anymore.

*Marecek I*, 130 N.C. App. at 306, 502 S.E.2d at 636. This is not the same testimony about which defendant now complains. Unlike Shaw's testimony in the most recent trial, the statements quoted above were inadmissible because they were "mere recitation of facts and were totally without emotion." *Id.* (internal quotation marks omitted).

Shaw testified at the most recent trial to Viparet's state of mind: she was upset and sad. The statement that Shaw should not "let him get away with it" implies fear or anger. We believe that these statements are "testimony that includes both statements of fact and emotion," and are thus admissible. *Id.* Accordingly, the admission of Shaw's testimony was not in error.

Defendant challenges the court's admission of certain portions of Preston's testimony, as follows:

A  Colonel Marecek got on the phone and I spoke to him in Czech and said, "Colonel Marecek"—

Q  What did you tell him at that time?

[DEFENSE COUNSEL]: Objection, hearsay, Your Honor.

THE COURT: Overruled.

A I said, in Czech, "Colonel Marecek, this is . . . Sergeant Preston, we met out in '84 in DLI." And he replied, in English, "Oh, I remember." And I said, "Sir, please speak Czech, this is serious." He said, "Go on." At that time, I said, "Sir, I got a phone call last night from your wife, she's trying to get hold of my wife, who is a teacher out here at the Special Forces school, and she wants her to translate some letters to be used in a divorce proceeding against you."

Q What, if anything, did Colonel Marecek say to you at that time?

[DEFENSE COUNSEL]: Objection, Judge, it's hearsay.

THE COURT: Overruled.

THE WITNESS: Colonel Marecek said, "We need to get together. Do you have the letters?" "No, I don't." "Well, let's get together and talk about it." We agreed to meet that following weekend at the Green Beret Sport Parachute club on Fort Bragg.

Q And did you, in fact, meet with Colonel Marecek the following week?

A Yes, sir, my wife and I met Colonel Marecek in front of the—what we call Brown's Bruce, it's a big statute of a Green Beret there on Fort Bragg, and then we drove to the Green Beret Sport Parachute Club, went inside and sat down, had a few beers, and talked.

. . . .

Q And could you describe what happened when you met with Colonel Marecek at the Green Beret club?

A My wife and I sat down with him and talked about the conversation I had had with Mrs. Marecek, Mrs. Viparat Marecek. She was concerned about him having a mistress in Prague.

[DEFENSE COUNSEL]: Judge, I object. This is irrelevant, and it's hearsay.

THE COURT: Overruled.

THE WITNESS: And we explained that I didn't have the letters, but that she was pretty serious about this, very upset.

[DEFENSE COUNSEL]: Judge, I object again, hearsay.

THE COURT: Overruled.

STATE v. MARECEK

[152 N.C. App. 479 (2002)]

THE WITNESS: She was very upset about the letters and concerned about his relationship with this woman in the Czech Republic.

[DEFENSE COUNSEL]: I would renew my objection, Your Honor. It's hearsay.

THE COURT: Overruled.

Preston testified that defendant expressed a desire to see the letters. Preston further testified that he called Viparet and asked her to bring him the letters, and she responded, "No, no, don't call me here." Preston then testified, over objection, that he told defendant about a call he received from Ingeborg Shaw. Preston testified that he told defendant, "I've been called by Mrs. Inge Shaw and she said to be very careful, that you don't want to get her in any trouble, she's very scared about this."

Again, this testimony contains statements of emotion as well as factual content. According to *Hardy*, statements of this kind are admissible. Thus, the trial court did not err. *See id.*

Defendant also objected to the admission of statements of Susan Kirk, although he does not specify which of Kirk's statements he finds objectionable. Defendant objected at trial to Kirk's testimony regarding statements that Kirk made to Viparet. Because Kirk was testifying to her own statements, these statements were not hearsay statements. *See* N.C. Gen. Stat. § 8C-1, Rule 801(c) (2001). Defendant contends in his Reply Brief that "the statements made by witnesses to the victim presupposed comments she would have made to them about defendant's conduct," and thus, "the challenged testimony essentially revealed the victim's statements which did not show her state of mind, but, suggested defendant's extramarital misconduct." We find this argument to be without merit.

III.

[3] Defendant next argues that the trial court erred in giving an instruction on implied admissions because the evidence did not support the instruction. After the court allowed counsel to review the court's proposed jury instructions, the following colloquy ensued:

[DEFENSE COUNSEL]: For the record, we would object to the instruction on implied admission. We do not feel it is appropriate in this case and, furthermore, that the evidence that was

presented in the case does not justify the giving of the instruction. In fact, Ms. Kirk said that when she made the statement to Mr. Marecek that his response was such that it was a denial.

THE COURT: What about Mr. Preston and his testimony? The record will reflect your objection, but I believe it's appropriate, and I'm going to give it. So the objection is overruled.

The court gave the following pattern jury instruction:

If a statement is made by another person in the presence of the defendant, under such circumstances that a denial would naturally be expected from the defendant if the statement was untrue, and it is shown that the defendant was in a position to hear and understand what was said and had an opportunity to speak, but failed to do so, then his failure to deny the statement would constitute an implied admission.

If you find that the defendant made such an implied admission, then you should consider all of the circumstances under which it was made, in determining whether it was a truthful admission and the weight you will give it.

Pursuant to the North Carolina Rules of Evidence, "[a] statement is admissible as an exception to the hearsay rule if it is offered against a party and it is . . . a statement of which he has manifested his adoption or belief in its truth." N.C. Gen. Stat. § 8C-1, Rule 801(d)(B) (2001). "A person may expressly adopt another's statement as his own, or an adoptive admission may be inferred from 'other conduct of a party which manifests circumstantially the party's assent to the truth of a statement made by another person.' " *State v. Sibley*, 140 N.C. App. 584, 588, 537 S.E.2d 835, 839 (2000) (quoting *FCX, Inc. v. Caudill*, 85 N.C. App. 272, 278, 354 S.E.2d 767, 772 (1987)). " 'Adoption or acquiescence may be manifested in any appropriate manner. When silence is relied upon, the theory is that the person would, under the circumstances, protest the statement made in his presence, if untrue. The decision in each case calls for an evaluation in terms of probable human behavior.' " *State v. Thompson*, 332 N.C. 204, 218-19, 420 S.E.2d 395, 403 (1992) (quoting N.C.G.S. § 8C-1, Rule 801(d) official commentary).

The testimony of Preston relating to an implied admission is the following:

STATE v. MARECEK

[152 N.C. App. 479 (2002)]

A I told [defendant], "George, I'm getting—this is starting to stink, it smells real bad. You're not as smart as you think you are. I know you did it, I know you killed her. Please don't tell"—

Q Who were you referring to at that time?

A I was referring to the murder of Viparat Marecek.

Q And continue. What happened after that?

A I told him I didn't want to know. I knew, but I didn't want him to tell me. I said, "You're pretty stupid. You've gone on around the world cruises for $20,000, you bought a new Cadillac, you're upgrading your house for $200,000. Just because you weren't able to buy your position in the Czech ministry of defense, doesn't mean you need to live like this. It's starting to stink. You're not as smart as you think you are. People are going to—the man is going to knock on your door."

Q And what, if anything, did he say to you at that time?

A I was being pretty forceful with him, and every time I would tell him, you know, hey, you know, you're buying a new car, this is stupid, your insurance money, redoing your blacktop driveway, this is starting to stink. "Ah, they've got nothing on me. They can't catch me." At the end of the conversation when I said, "They're going to dig her up, they'll find some forensic—some scientific evidence to convict you," he said, "They can't, I burned her body, sent her back." And then he reached over and grabbed me, real strong grip, and he was in his cups, and said, "They'll never catch me, I'm too smart for them."

Q Did he ever deny killing Viparat at that time?

A No.

Defendant relies on *State v. Spaulding*, 288 N.C. 397, 219 S.E.2d 178 (1975), *vacated in part on other grounds sub nom. Spaulding v. North Carolina*, 428 U.S. 904, 49 L. Ed. 2d 1210 (1976), to argue that an implied admission instruction here constituted error. *Spaulding*, however, did not involve a jury instruction. Rather, at issue was the admissibility of a statement allegedly adopted by the defendant. Here, defendant did not object to the testimony when it was offered at trial, nor does he now argue that the testimony was inadmissible. Instead, he argues that the statement did not support giving a jury instruction on implied admission. We conclude that the testimony contained both express and implied admissions and did support the instruction.

In *Spaulding*, the Supreme Court stated:

> Implied admissions are received with great caution. However, if the statement is made in a person's presence by a person having firsthand knowledge under such circumstances that a denial would be naturally expected if the statement were untrue and it is shown that he was in position to hear and understand what was said and had the opportunity to speak, then his silence or failure to deny renders the statement admissible against him as an implied admission.

*Id.* at 406, 219 S.E.2d at 184. Defendant contends that Preston did not have "any knowledge of the facts," as required by *Spaulding*. *Spaulding* is inapposite here, however, because *Spaulding* addressed a situation where a defendant was silent in the face of a statement. *See id.* When a defendant is silent in the face of a statement, the inference that the defendant agrees with that statement is a difficult one to draw. Here, defendant was not silent. On the contrary, he allegedly responded, "They can't [find evidence], I burned her body, sent her back . . . . They'll never catch me, I'm too smart for them." Defendant's reported failure to deny that he killed his wife, along with these incriminating statements, "manifest[] circumstantially [his] assent to the truth" of Preston's statement that defendant killed his wife. *Sibley*, 140 N.C. App. at 588, 537 S.E.2d at 839 (internal quotation marks omitted).

We hold that Preston's testimony supported the trial court's instruction on implied admissions. Thus, we need not address Kirk's testimony, to which defendant also objected at trial.

IV.

**[4]** Defendant contends that the trial court erred by preventing him from offering testimony from two witnesses to bolster his own credibility. Defendant did not testify. However, the prosecution introduced the written statements made by defendant to police, and then later offered evidence contrary to defendant's statements. Thus, defendant argues, his credibility was put at issue, and he should have been allowed to offer evidence of his character for truthfulness.

Defense counsel first attempted to elicit Alphonso Woodall's opinion of defendant's reputation for truthfulness and honesty, but the court sustained the State's objection. The court held a bench conference, but the defense made no proffer.

Then, after a similar ruling, defense counsel asked for and was allowed the opportunity to make a proffer of Lupiak's testimony to the same effect. That testimony is as follows:

Q Sergeant Major Lupiak, do you have, based upon your observation of Colonel Marecek and your knowledge of his reputation, do you have an opinion, satisfactory to yourself, as to his truthfulness and veracity?

A I do.

Q Can you state that opinion, please?

A Yes, I can.

Q Would you please state it?

A I believe George is probably one of the most truthful and down-to-earth type individuals I've run across in many, many years. He's a straight down the line individual. He would do nothing to desecrate his integrity. He's—anything he does has always been above reproach in his actions in the military as well as what I've seen on the civilian side of the house, as well. He's just—and you know, I'm not saying this because I'm European, but George and I were brought up in the same type of lifestyle, and we were taught to be truthful, to be honest, and to be aboveboard, and that's why George is the decorated hero he is, because he put other personnel above himself. He did those things, and those are some of the things I highly respect George for because, after what he did in combat situation, as well.

Q And do you also have an opinion, satisfactory to yourself, concerning George Marecek's character trait for being a peaceful and law-abiding citizen?

A Yes, I do.

Q Can you state that opinion, please?

A George—the only time I've ever seen George in anything that's not peaceful is when he gets upset when somebody goofs up in the military and does something that is stupid. He would get upset, because he wanted to make sure it was on the right track and it was the right way to do the thing; and, other than that, I've never seen him—I've never really seen him lose his temper. He gets angry, like anybody else, but not to the point where it was

extreme, just because it's human nature and it was from something that was done dumb by somebody else.

Lupiak did testify before the jury to defendant's honorable service in the military, and to his opinion that defendant was law-abiding and a man of integrity.

Defendant's statements to police officers were hearsay, but they were admissible as admissions of a party-opponent. *See* N.C.G.S. § 8C-1, Rule 801(d). Hearsay statements are subject to the same rules governing impeachment or corroboration as other statements. *See State v. Stevens*, 295 N.C. 21, 33, 243 S.E.2d 771, 779 (1978).

A witness' credibility may not be supported until after that witness' character for truthfulness has been attacked. *See* N.C. Gen. Stat. § 8C-1, Rule 608(a)(2) (2001). We agree with defendant that his character for truthfulness was impugned by the introduction of evidence contrary to his written statement that he gave to police. *See State v. Bethea*, 186 N.C. 22, 24, 118 S.E. 800, 800 (1923) ("This Court has often held that whenever a witness has given evidence in a trial and his credibility is impugned . . . by testimony contradicting his . . ., it is permissible to corroborate and support his credibility by evidence tending to restore confidence in his veracity and in the truthfulness of his testimony."); 1 *McCormick on Evidence* § 33, at 124 (John W. Strong ed., 5th ed. 1999) (observing that one main method of attacking a witness' credibility is "proof by other witnesses that material facts are otherwise than as testified to by the witness under attack"). Therefore, even though defendant did not testify, his credibility was impugned, and he should have been allowed to offer evidence regarding his character for truthfulness.

Although we believe that the trial court erred in refusing to allow the admission of the testimony, we do not find that this error warrants a new trial. To establish prejudice, a defendant has the burden of showing that "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial." N.C. Gen. Stat. § 15A-1443(a) (2001). Defendant has failed to carry his burden.

Defendant contends that this error was prejudicial because evidence of defendant's "stellar reputation for truthfulness" would have encouraged the jury to believe his account over the circumstantial evidence of the State. Thus, defendant's argument that he was prejudiced by the exclusion of this testimony is based on the assumption that the testimony would have enhanced the weight of his written

account of events. We note that, because defendant made no proffer of the testimony Woodall would have given, we can only consider Lupiak's proposed testimony in our analysis.

We find that the exclusion of Lupiak's testimony was not prejudicial for two reasons. First, defendant put on testimony from several witnesses that was consistent with his statement that he returned to the beach after lunch. Both Thai Truong and Susan Abe testified that defendant and Viparet were together on the beach on the morning of Monday, 3 June 1991, but that defendant was alone on the beach in the afternoon and remained there until 5:00. David Kelly testified that he saw Viparet walking alone on the road that led from her cottage towards the beach between 3:15 and 3:45 on Monday afternoon. Richard Tobin testified that he saw Viparet when he was leaving the reception center and she was coming in, at about 4:00 p.m. that afternoon. Tobin then passed Viparet again at about 4:25 p.m. Thus, defendant's story was corroborated by other witnesses. Moreover, the defense effectively cross-examined the State's witnesses, whose accounts of defendant's whereabouts differed. Evidently, the jury chose to discount the testimony of defendant's witnesses. We are not persuaded that there is a reasonable possibility that the jury would have believed this testimony, as well as defendant's account, simply because they heard Lupiak's testimony that defendant had a "stellar reputation" for honesty.

Second, although the State's case was circumstantial, the State did present evidence that was quite damning to defendant. In particular, Russell Preston testified that he had the following exchange with defendant:

I was being perfectly forceful with him, and every time I would tell him, you know, hey, you know, you're buying a new car, this is stupid, your insurance money, redoing your blacktop driveway, this is starting to stink. "Ah, they've got nothing on me. They can't catch me." At the end of the conversation when I said, "They're going to dig her up, they'll find some forensic—some scientific evidence to convict you," he said, "They can't, I burned her body, sent her back." And then he reached over and grabbed me, real strong grip, and he was in his cups, and said, "They'll never catch me, I'm too smart for them."

The defense attacked Preston's credibility on cross-examination, and Lupiak, who worked closely with Preston for approximately two years, testified to his opinion that Preston was untruthful.

Nevertheless, the jury, in convicting defendant, apparently believed Preston's testimony. Additionally, Inge Shaw testified that Viparet was fearful that she would not return from the trip to the beach and that Viparet instructed Shaw to call police and not "let him [defendant] get away with it." Defendant challenged the court's admission of both portions of testimony, but we have rejected those arguments.

We do not think there is a reasonable possibility that the jury would have acquitted defendant on the basis of one witness' testimony that defendant had a stellar reputation for honesty. *Cf. State v. Murray*, 27 N.C. App. 130, 132-33, 218 S.E.2d 189, 191 (1975) (finding prejudicial trial court's error in excluding testimony that would have impeached witness whose testimony constituted the only evidence connecting defendant to crime). Accordingly, this assignment of error is overruled.

V.

**[5]** Defendant argues that the trial court erred in overruling his objections to evidence that defendant owned a club or nightstick. Specifically, defendant objects to the following testimony of his son:

Q  All right, sir. Now, Mr. Marecek, I'll ask you when you were living in Germany, did you see your father in possession of a nightstick or club?

[DEFENSE COUNSEL]:  Objection as to relevancy, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  Yes, sir, I did. It was probably 12, 14 inches long, black, I thought, military-style nightstick.

Q  How heavy was the stick you saw? Strike that. Was it heavier on one end than the other?

A  Right. The bigger end, the hitting end, was weighted, versus the hand end.

Q  Did you ever handle that nightstick yourself?

A  One time I took it out and broke some bottles with it.

Q  Now, what about what year would it have been that you had seen it over in Germany?

A  Probably '69 or '70.

Q Now, when is the last time you saw that nightstick, Mr. Marecek?

A Probably in 1988.

Q Where were you then when you saw it, it you recall?

A At my sister's house.

. . . .

Q Where did you see it when you saw it on that occasion?

A In the trunk of my father's car.

Defendant also objects to Russell Preston's testimony about the stick. Preston had been describing several encounters he had with defendant in May 1991 concerning some letters that defendant's wife wanted to have translated. Preston then recalled the following interchange between defendant and himself:

Q And what, if anything else, happened at that point in time?

A When I mentioned Inge Shaw—and again, I had never met Mrs. Shaw to this point—he had said—he says, "F-ing bitch, I'm getting tired of her crap." And again, we were up in the garage at his home. And then he had—I said, "You got to watch out, Sergeant Major Mafia is in Force."

Q Why did you say that?

A Because Special Forces is a close-knit community, and there's always a little bit of conflict, if you will, between the officers and the enlisted swine. And I told him, "You need to be careful of the Sergeant Major Mafia," and he reached under the front seat of his car, or somewhere in the front—and pulled out a club and whacked it on his leg and says, "I'm not worried about them, I got something for them."

Q Can you describe the club that he pulled out?

A Not very well, sir, it was dark in the garage, it was—he had it in his hand, and it stuck out several inches, and looked to be thin, about finger size in length, maybe perhaps a little bit bigger, and made a nice pop when he whacked it on his pant leg.

Finally, defendant objects to the testimony about the club by Richard McCall, a good friend and neighbor of defendant and his wife. McCall testified as follows:

Q Now, if I could direct your attention back to a period of time, approximately 1986 or 1987, did you have an occasion to go with Mr. Marecek into his—the garage of his home in Fayetteville?

A Yes, I did.

Q And could you tell the jury the circumstances surrounding that?

A The precise circumstances, I do not recall, except that the entrance to the Marecek's home, normally for, I guess, for informal visitors like us, was through the back door, and the back door was adjacent to the garage. And on this occasion, I remember going into Colonel Marecek's garage, and he was telling me that he was not concerned with being involved in—involved with being stopped by bad guys because he had something for them. And he opened up his car door and he reached either under the seat or into the glove compartment, I couldn't tell which, and he pulled out an item and said, "I have this," and he handed it to me, and it was what I would call a billy club or a blackjack.

Q Could you describe how large this billy club or blackjack was, Colonel McCall?

A Yes. My memory is that it was probably eight to twelve inches in length. The base of it seemed to be—it was a rod, a lead rod, or a heavy metal rod, as big or bigger than my finger. As I recall, it was wrapped with intertwined or interlacing leather, and I recall it had a strap so you could strap it on to your hand, and I remembered how remarkably heavy it was, for such a short item to be so—to be so heavy.

Q And after Colonel Marecek gave you this blackjack, did you give it back to him?

A Yes, I did. I hit it on my hand, and I thought, this thing is pretty powerful, this is a powerful weapon. I gave it back to him.

Q Did you see where he put it after you gave it back to him?

A He put it back into his automobile.

Defendant did not assign error to the admission of the testimony about the club recounted above. He states in his brief that he "is moving to amend the record on appeal to add this assignment of error." However, the court has received no formal motion from

defendant. In the exercise of our discretion, however, we address this assignment of error. *See* N.C.R. App. P. 2.

Defendant argues that this testimony should not have been admitted because it was not relevant. *See* N.C. Gen. Stat. § 8C-1, Rule 402 (2001). We note that defendant did not argue at trial, nor does he argue now, that admission of this testimony violated Rule 403 or any other rule of evidence. *See* N.C. Gen. Stat. § 8C-1, Rule 403 (2001). We disagree that this evidence was irrelevant.

Evidence is "relevant" if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401 (2001). Generally, all relevant evidence is admissible. *See* N.C.G.S. § 402. Our Supreme Court has stated that "in a criminal case every circumstance calculated to throw any light upon the supposed crime is admissible and permissible." *State v. Bruton*, 344 N.C. 381, 386 474 S.E.2d 336, 340 (1996) (internal quotation marks omitted).

"Whether the evidence should be excluded is a decision within the trial court's discretion. Hence, the trial court's decision will not be disturbed, unless it is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *State v. Burgess*, 134 N.C. App. 632, 635, 518 S.E.2d 209, 211-12 (1999) (citation and internal quotation marks omitted).

Dr. Robert Thompson, who performed the autopsy on Viparet, testified that she had several lacerations and abrasions on her head and face and a hairline fracture on her skull, all of which were inflicted with a blunt object. He testified that she also had defensive wounds on her hands and arms. Dr. Thompson testified that, although these wounds would not have been fatal, the victim "might have been knocked unconscious, or they could have been just, you might say, out a little bit and not been unconscious." In his opinion, the cause of death was drowning.

The witnesses' testimony that defendant, as recently as a month before the murder, kept a nightstick in his car is relevant to the State's theory that defendant inflicted the blunt-force injuries on his wife, and then caused her to drown. It tended to show that he possessed an instrument that could have been so used. Defendant argues that the nightstick was irrelevant because the State did not connect the nightstick to the murder. Defendant's position is undermined by *Bruton*, cited by defendant. In *Bruton*, the defendant argued that the trial

court should not have admitted certain evidence, including numerous nine-millimeter cartridges, that had been seized from his residence. The Court held that

> [t]he evidence at trial did not link any of the items seized at defendant Bruton's residence with the killing of the victim. However, the extensive inventory of nine-millimeter cartridges found at defendant Bruton's residence supported that State's theory that defendant Bruton owned a nine-millimeter weapon, used it in the killing of the victim, and disposed of it after the killing. For this reason the nine-millimeter cartridges were relevant and admissible.

*Bruton*, 344 N.C. at 386-87, 474 S.E.2d at 340-41. Similarly, the evidence regarding defendant's possession of a nightstick supported the State's theory that defendant injured his wife with a blunt object and then caused her to drown.

Defendant also cites *State v. Patterson*, 59 N.C. App. 650, 297 S.E.2d 628 (1982), in support of his position. However, the issue in *Patterson* was whether it was error to admit a weapon itself into evidence when there was no evidence connecting the weapon that was admitted to the weapon used to commit the crime. *See id.* at 653, 297 S.E.2d at 630. Here, the nightstick was not admitted into evidence.

We conclude that the trial court did not abuse its discretion in allowing the testimony into evidence. Accordingly, this assignment of error is overruled.

VI.

Finally, defendant argues that the trial court erred in sentencing him in excess of the presumptive range because the aggravating factor found by the court was not supported by the evidence, and the court failed to find a statutory mitigating factor that was supported by uncontradicted evidence. Although we disagree with defendant that the trial court erred in failing to find a statutory mitigating factor, we agree that the court erred in finding an aggravating factor that was unsupported by the evidence.

[6] Because defendant was sentenced for a crime that occurred prior to 1 October 1994, he was sentenced under the Fair Sentencing Act. *See* N.C. Gen. Stat. § 15A-1340.10 (2001). Defendant argues that the trial court erred in failing to find that he lacked any criminal convictions. *See* N.C. Gen. Stat. § 15A-1340.4(a)(2)(a) (1988). Joseph Lupiak

testified that defendant is a law-abiding citizen who would do nothing to harm his integrity. Defendant characterizes this testimony as "substantial, uncontradicted evidence that he had no record of criminal convictions." We disagree.

The burden is on the defendant to establish a mitigating factor by a preponderance of the evidence. *See State v. Crisp*, 126 N.C. App. 30, 41, 483 S.E.2d 462, 469, *appeal dismissed and disc. review denied*, 346 N.C. 284, 487 S.E.2d 559 (1997). Our Supreme Court has explained that uncontradicted evidence is not necessarily sufficient to meet the defendant's burden of proof:

> [U]ncontradicted, quantitatively substantial, and credible evidence may simply fail to establish, by a preponderance of the evidence, any given factor in aggravation or mitigation. While evidence may not be ignored, it can be properly rejected if it fails to prove, as a matter of law, the existence of the mitigating factor.

*State v. Blackwelder*, 309 N.C. 410, 419, 306 S.E.2d 783, 789 (1983). Here, the defendant did not present any direct evidence regarding his criminal record. Accordingly, the trial court did not err in failing to find as a mitigating factor that the defendant had no criminal record.

**[7]** Defendant argues that the trial court erred in finding as an aggravating factor that he took advantage of a position of trust or confidence. *See* N.C. Gen. Stat. § 15A-1340.4(a)(1)(n) (1988); *see also* N.C. Gen. Stat. § 15A-1340.16(d)(15) (2001) (same factor under Structured Sentencing). Defendant contends that there was insufficient evidence supporting this factor. We agree.

"The State bears the burden of persuasion on aggravating factors by a preponderance of the evidence." *Crisp*, 126 N.C. App. at 37, 483 S.E.2d at 467. Citing *State v. Arnold*, 329 N.C. 128, 144, 404 S.E.2d 822, 832 (1991), the State asserts that the evidence shows defendant "lead [sic] his wife to believe everything was fine in their marriage and took advantage of a long-planned family vacation to lure her to the beach and end her life in order to collect the proceeds from a life insurance policy and to marry his mistress." However, our Supreme Court stated in *Arnold* that while "the husband-wife relationship permits the finding" of this aggravating factor, "[i]n some marriage-related situations, finding this aggravating factor may be inappropriate." *Id.* The Court held that the evidence in *Arnold* warranted finding the aggravating

factor because the husband-victim "did not distrust his wife, but rather believed that she had 'come to her senses' and ended her relationship with [another man]." *Id.* Significantly, there was evidence to show that the defendant in *Arnold* plotted with another man to send her husband to a church on a pretense to retrieve her purse, where he was murdered. *See id.* at 133-37, 483 S.E.2d at 825-28. Furthermore, in *State v. Mann*, 355 N.C. 294, 560 S.E.2d 776 (2002), our Supreme Court noted that "[o]ur courts have upheld a finding of the 'trust or confidence' factor in very limited factual circumstances." 355 N.C. at 319, 560 S.E.2d at 791.

In contrast to the evidence in *Arnold*, the evidence here suggests that Viparet distrusted defendant and feared him. There was no evidence showing that defendant exploited his wife's trust in order to kill her. We conclude that the trial court erred in finding this aggravating factor. *See id.*, 560 S.E.2d at 791-92 (collecting cases). Therefore, defendant is entitled to a new sentencing hearing. *See State v. Ahearn*, 307 N.C. 584, 602, 300 S.E.2d 689, 701 (1983) (holding that "in every case in which it is found that the judge erred in a finding or findings in aggravation and imposed a sentence beyond the presumptive term, the case must be remanded for a new sentencing hearing").

No prejudicial error at trial, remanded for resentencing.

Chief Judge EAGLES and Judge BRYANT concur.