STATE OF NORTH CAROLINA v.RAE LAMAR WIGGINS, A/K/A, RAE CARRUTH

No. COA02-959

(Filed 5 August 2003)

**1. Evidence— hearsay—victim's handwritten statements— present sense impressions—harmless error**

A shooting victim's handwritten statements about events leading up to and during the shooting made seven hours after the shooting and after the victim had undergone general anesthesia and surgery were not admissible under the present sense impression hearsay exception; however, the admission of these written statements was harmless error beyond a reasonable doubt where the same information contained in the statements was properly introduced into evidence through the victim's 911 call and the testimony of other witnesses.

**2. Evidence— hearsay—defendant's drug deal/revenge theory of case**

The trial court did not err in a conspiracy to commit murder, firing a gun into occupied property, and using an instrument with intent to destroy an unborn child case by excluding evidence of and failing to instruct on defendant's theory of the case that his two alleged coconspirators were seeking revenge on defendant based on the fact that they were angry with defendant for refusing to finance a drug deal, because: (1) the statements were self-serving, were sought to be admitted for the truth of the matter asserted, and were not evidence of defendant's state of mind; and

STATE v. WIGGINS

[159 N.C. App. 252 (2003)]

(2) defendant's drug deal/revenge theory was not supported by any evidence admitted for substantive purposes at trial.

### 3. Jury— selection—peremptory challenges—black jurors— racial discrimination

The trial court did not err in a conspiracy to commit murder, firing a gun into occupied property, and using an instrument with intent to destroy an unborn child case by allowing the peremptory strikes of black jurors, because: (1) the prosecutor offered race-neutral explanations for striking each of the eight black jurors; and (2) where the only factor supporting an inference of discrimination is the disproportionate number of prospective black jurors peremptorily challenged by the State and other elements relevant to finding an inference of discrimination are not present, the trial court's determination that the State did not purposefully discriminate on the basis of race is not clearly erroneous.

### 4. Jury— selection—peremptory challenges—gender discrimination

The trial court in a conspiracy to commit murder, firing a gun into occupied property, and using an instrument with intent to destroy an unborn child case did not improperly fail to assess gender discrimination against black males in the juror selection, because: (1) after reviewing the totality of circumstances the trial court concluded as a matter of law that the reasons proffered by the State for its excusal of each juror are acceptable, non-pretextual, race-neutral, and gender neutral; and (2) the trial court's order indicated that in light of the State's rebuttal testimony, it accepted those justifications and concluded the State had acted in a gender neutral fashion.

### 5. Jury— recordation of numerical division—order to deliberate further

The trial court did not commit plain error in a conspiracy to commit murder, firing a gun into occupied property, and using an instrument with intent to destroy an unborn child case by asking the jury to record its numerical division and to deliberate further, because: (1) the trial court did not ask the jurors for their numerical split, but requested they keep an internal record of the votes; (2) the trial court reinstructed the jury after making this request, reminding the jurors that they should continue to deliberate while remaining true to their convictions; and (3) given the total-

ity of circumstances and substance of the instruction, no plain error was committed.

**6. Sentencing— aggravating factor—took advantage of a position of trust or confidence**

The trial court did not err in a conspiracy to commit murder, firing a gun into occupied property, and using an instrument with intent to destroy an unborn child case by finding the aggravating factor that defendant took advantage of a position of trust or confidence, because: (1) the crimes against the victim could not have been carried out without the active participation of defendant and the trusting relationship between defendant and the victim; and (2) although defendant contends the victim knew defendant was romantically involved with other women, it would not cause the victim to be in doubt for the safety of her life and that of her unborn child around defendant, who was the father of that unborn child.

**7. Sentencing— mitigating factors—aid in apprehension of felon—support of family—extensive support system in the community**

The trial court did not err in a conspiracy to commit murder, firing a gun into occupied property, and using an instrument with intent to destroy an unborn child case by failing to find the mitigating factors of aid in apprehension of another felon, defendant's support of his family, and presence of an extensive support system in the community, because: (1) whatever consideration defendant earned by helping the police was offset by his earlier denials of wrongdoing; (2) the fact that defendant provides money to various family members is not per se sufficient where there was evidence that defendant did not voluntarily provide other means of support, and a possible motive for the crimes was to avoid paying child support; and (3) although defendant presented evidence that he had many friends in Charlotte who liked and cared for him, defendant failed to show the existence of a support system in the community.

Appeal by defendant from judgments entered 11 January 2001 by Judge Charles C. Lamm in Mecklenburg County Superior Court. Heard in the Court of Appeals 10 June 2003.

STATE v. WIGGINS

[159 N.C. App. 252 (2003)]

*Attorney General Roy Cooper, by Assistant Attorney General William B. Crumpler, for the State.*

*Rudolf Maher Widenhouse & Fialko, by M. Gordon Widenhouse, Jr., for defendant.*

TYSON, Judge.

Rae Lamar Wiggins, also known as Rae Carruth ("defendant"), appeals from judgments entered upon a jury's verdict finding him guilty of conspiracy to commit murder, firing a gun into occupied property, and using an instrument with intent to destroy an unborn child. Defendant was sentenced to an active term of imprisonment of 196 months to 245 months for conspiracy to commit murder. Concurrent sentences of 31 to 47 months were imposed for the remaining convictions.

## I. BACKGROUND

On the evening of 15 November 1999, defendant and his eight-months pregnant girlfriend, Cherica Adams ("victim"), watched a movie at a Charlotte theater. The two left the movie theater and rode together to defendant's house to retrieve the victim's car. While there, defendant called Michael Kennedy ("Kennedy") and told him that he and the victim were about to leave. Victim followed defendant in her vehicle toward her home. As they drove along two-lane residential Rea Road, defendant slowed or stopped his large sport utility vehicle in front of the victim's car. Victim could not drive her car around defendant's vehicle. Kennedy drove his rented vehicle beside the victim's car. Van Brett Watkins ("Watkins"), a passenger, fired five shots from the rental vehicle into the victim's car. The victim was wounded four times, once in the neck and three times in the back. Defendant's and Kennedy's vehicles fled the scene in different directions.

The victim called 911 from her cell phone at 12:31 a.m., pulled into a residential driveway, continuously blew the horn, and remained on the phone for over twelve minutes until an ambulance arrived. In her call to 911, the victim described the shooting in detail and informed the dispatcher and an emergency medical technician that she had been following defendant, who was her boyfriend and her baby's father.

Mecklenburg Police Officer Peter Grant ("Grant") arrived on the scene around 12:43 a.m. The victim identified defendant to Grant as the driver of the vehicle that she had also described in the 911 call.

The victim was transported by ambulance to Carolinas Medical Center and arrived at 1:10 a.m. The victim gave Grant a complete chronology of the events that transpired during the night and early morning. Emergency surgery was performed to remove the bullets and deliver the baby from the victim at 1:30 a.m. At 4:00 a.m., the victim was taken to a trauma intensive care unit. Around 7:00 a.m., an endotracheal tube was inserted into victim's throat. Traci Willard ("Willard"), the morning nurse, asked the victim if she remembered what had happened to her. The victim nodded and motioned for Willard to bring a pen and paper to her. The victim handwrote notes describing the shooting and events of the morning and previous evening. Later, the victim's father asked her if there were any stop signs on the road that would provide defendant a legitimate reason to stop in the road. The victim shook her head negatively. The victim died 14 December 1999 as a result of the inflicted wounds. Victim's infant son survived.

Defendant was charged with and tried capitally for first-degree murder of the victim, conspiracy to commit murder, discharge of a firearm into occupied property, and the use of an instrument to destroy an unborn child. The State presented testimony from co-conspirators, Watkins and Kennedy. Defendant did not testify but presented evidence. A jury found defendant guilty of conspiracy to commit murder, discharge of a firearm into occupied property, and use of an instrument to destroy an unborn child. Defendant appeals.

## II. Issues

Defendant's assignments of error raise the following issues: (1) whether the notes written by the victim at the hospital are inadmissible hearsay; (2) whether the exclusion of defendant's theory of the case and the trial court's failure to instruct the jury on his theory constituted reversible error; (3) whether the trial court erred in allowing the peremptory strikes of black jurors; (4) whether the trial court erred in failing to assess gender discrimination in the juror selection; (5) whether the trial court erred in asking the jury to record its numerical division and to deliberate further; and (6) whether the trial court erred in determining the aggravating and mitigating sentencing factors.

## III. Hearsay Statements

[1] Defendant argues that the handwritten notes the victim wrote after awaking from surgery are inadmissible hearsay. The trial court

admitted the hearsay statements as present sense impressions, an allowed exception under N.C. Rule of Evidence 803(1).

"[P]resent sense impression" is defined as "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or *immediately thereafter.*" N.C.G.S. § 8C-1, Rule 803(1) (2001) (emphasis supplied). Our Supreme Court analyzed the meaning of "immediately thereafter" in *State v. Cummings*, 326 N.C. 298, 389 S.E.2d 66 (1990).

> Interpreting the identical Federal Rule, the federal courts have held that "there is no *per se* rule indicating what time interval is too long under Rule 803(1). . . . [A]dmissibility of statements under hearsay exceptions depends upon the facts of the particular case." *United States v. Blakey*, 607 F.2d 779, 785 (7th Cir. 1979). Here, [the victim's] statement was made in close proximity to the event—a reasonable inference would be the length of time it took to drive from Willow Springs to her mother's house in Raleigh. Under the particular facts of this case, [the victim's] statement to her mother was made sufficiently close to the event to be admissible as present sense impressions under Rule 803(1).

*Id.* at 314, 389 S.E.2d at 75. The reason for the present sense impression hearsay exception is that closeness in time between the event and the declarant's statement reduces the likelihood of deliberate or conscious fabrication or misrepresentation. *State v. Gainey*, 343 N.C. 79, 87, 468 S.E.2d 227, 232 (1996).

The State argues that the victim's statements made soon after the victim awoke from surgery qualify as a present sense impression. The State contends that the victim's time in surgery should be removed from the length of time between the shooting and the writings because the victim could not communicate during the surgery. Even after subtracting the length of time the victim spent in surgery and recovery, nearly two additional hours elapsed between the event and the written statement. Defendant argues the victim's written statements were not a present sense impression, but an inadmissible past sense impression. Although the risk is low that the victim formed or seized an opportunity to manipulate the truth, we cannot hold as a matter of law that statements made approximately seven hours after the shooting and after the declarant had undergone general anesthesia and surgery fit within the present sense impression hearsay exception. *See State v. Taylor*, 344 N.C. 31, 47, 473 S.E.2d 596, 605 (1996) (statement allowed as a present sense impression where it

was made immediately after declarant had perceived the condition); *State v. Odom*, 316 N.C. 306, 313, 341 S.E.2d 332, 336 (1986) (statement allowed as present sense impression where declarant made statement within ten minutes of perceiving abduction).

The State alternatively argues that the statements were admissible under Rule 804(b)(5), which allows admission of trustworthy hearsay consistent with the interests of justice. We disagree. The trial court did not make findings for this hearsay exception to apply as required by *State v. Triplett*, 316 N.C. 1, 340 S.E.2d 736 (1986). The issue becomes whether this hearsay error was prejudicial or harmless beyond a reasonable doubt. If the same information contained in the victim's written statement was properly introduced into evidence through other witnesses or means, any error in admitting the victim's statement would be harmless beyond a reasonable doubt.

The written statements provide details about the events leading up to and during the shooting. The victim wrote that defendant called someone before they left his house and stated, "we were leaving now." Other comments in the statement included "[h]e was driving in front of me & stopped in the road & a car pulled [up] beside me & he blocked the front & never came back" and "[h]e insisted on coming to my house."

These statements corroborated other properly admitted evidence. Kennedy testified that he received a telephone call from defendant just after midnight on 16 November 1999. Defendant told Kennedy that "[defendant] was at his house and he was getting ready to leave the house." When asked specifically what defendant said, Kennedy replied, " 'We're getting ready to leave the house.' " Kennedy also testified to the sequence of events that corroborated the victim's statements. "Rae went over a hill and then down in the dip. Then, he stopped his car; she stopped behind his; I stopped behind her. Then, Watkins told me to pull up beside her car. So, I pulled up beside her car and he started shooting in her car." When asked the distance between defendant's and the victim's vehicles, Kennedy replied "[m]aybe a foot or so; because he stopped, suddenly." Watkins began firing "[a]s soon as we pulled up beside." Defendant's vehicle "pulled off" as Kennedy turned his vehicle around in a driveway.

Officer Grant testified that he asked the victim at the scene if she knew who had shot her. The victim answered "Rae Carruth." Grant asked her if defendant was the person driving the vehicle she described in the 911 call. She replied, "Yes, yes. That's my baby's

daddy." She gave to Grant the defendant's home address. Grant continued his questioning of the victim at the hospital. After Grant inquired, "Did your boyfriend do this to you?," victim nodded affirmatively. When asked what happened, the victim told Grant that she and defendant had attended a movie that night and had traveled back to defendant's house to retrieve her car. "She was following Rae Carruth, down Rea Road. She said that along Rea Road, Rae Carruth came to a stop. She had to stop; because at the point in time where they stopped, it was only a 2-lane road; and, she couldn't to (sic) around, either way. And she said, when they stopped the car, a car pulled up next to her; and, shots began firing."

Candace Smith ("Candace"), a girlfriend of defendant, came to the hospital and saw defendant the morning of the shooting. She testified that defendant told her "he wished that she [Cherica] would die." Candace asked defendant outside the presence of others if he had anything to do with the victim being shot. "[H]e wouldn't even look at me. And, he said that he had been trying to be nice to her; and, go to doctors appointments and give her money; and keep her happy. . . . And, that he had been getting money out the bank, a little bit at a time, so it wouldn't look suspicons (sic), to give to the guy. And, he said he watched the guy—well, he hit his brakes, in his car, to slow her car down. And, he saw the guys pull up and shot into her car. . . . And, he said, 'I just drove off and went to Hannibal's house.' "

The victim's recorded 911 call and the testimony of Kennedy, Grant, and Candace duplicate the victim's written statements. The only portion of the victim's statements allowed into evidence that was not directly corroborated by other evidence was that defendant "insisted on going to [the victim's] house."

The victim telephoned her cousin, Modrey Floyd, at 12:15 a.m. on 16 November 1999, and indicated that it was not the victim's decision to go to her house. Floyd testified, "[Cherica] said that she and Rae were on their way over to the apartment. She asked if I could straighten up because she didn't—she wasn't expecting him to come over."

Given the nature and extent of the State's evidence implicating defendant's involvement in the shooting, the recorded 911 call and witnesses' testimony that duplicated the victim's written statements, we hold that any error in admitting the victim's written statement was harmless beyond a reasonable doubt.

### IV. Exclusion of Defendant's Theory and Failure to Instruct

[2] Defendant alleges his constitutional rights were violated when the trial court did not allow presentation of evidence and failed to instruct the jury on defendant's theory of the case. Defendant asserts that he was not part of any conspiracy to kill the victim, and contends that Watkins and Kennedy sought revenge for his failure to finance a drug deal. Their revenge was taken out against the victim.

Defendant put forth and the trial court admitted evidence supporting this theory through testimony of Mecklenburg County Sheriff Sergeant Shirley Riddle ("Riddle"). This evidence was limited to impeachment purposes by the trial court. Riddle testified that she walked inside Watkins' jail cell to retrieve his "do-rag." Watkins blocked her exit and said, " 'I've got to talk to you.' " Riddle explained to Watkins that she was not supposed to talk to him about his case.

Watkins said to Riddle, " 'I told Kennedy to pull up beside of Cherica's car; we had lost track of Rae; we wanted to see which way he was headed.' . . . 'I started waving my arms to get her to slow down.' . . . 'We were just going to ask her if she knew where Rae was going. And then, she slowed down.'. . . 'I was telling her to roll her window down so we could talk to her.' . . . 'She flipped me off.' . . . 'I just lost it; I lost control.' . . . 'If [Rae] had just given us the money, none of this would have happened.' "

Defendant's statements made to Leonard Kornberg, his prior attorney, were not allowed into evidence. The excluded evidence was defendant's belief that Watkins and Kennedy were angry with him because he had refused to finance a drug deal. The trial court excluded this evidence as a self-serving declaration and hearsay, not within the state-of-mind exception. Similar statements defendant made to James Lasco, his bail bondsmen, were excluded on the same basis.

Defendant argues that *Chambers v. Mississippi*, 410 U.S. 284, 35 L. Ed. 2d 297 (1973) supports his assertion that his constitutional rights were violated by the exclusion of this evidence. The United States Supreme Court in *Chambers* overturned a defendant's conviction where defendant was not allowed to examine a witness as an adverse witness because the witness did not accuse the defendant and a Mississippi rule would not allow a party to impeach its own witness. *Id.* at 297, 35 L. Ed. 2d at 310. The Court found as a second prong for overturning the conviction that hearsay evidence of a wit-

ness's confession to the crime with which defendant was charged should have been admitted. *Id.* at 300-02, 35 L. Ed. 2d at 311-13. Defendant's assertion that *Chambers* applies at bar is misplaced. The witness in *Chambers* testified under subpoena at the defendant's trial and could be cross-examined regarding his prior statements. Defendant did not testify, could not be forced to testify against himself, and he was not subject to cross-examination concerning statements he reportedly made to his former attorney and bondsman. The statements were self-serving, were sought to be admitted for the truth of the matter asserted, and were not evidence of defendant's state of mind. Defendant's assignment of error is overruled.

Defendant also argues that the trial court erred in not instructing the jury on defendant's theory of the case. Defendant's drug deal/revenge theory is not supported by any evidence admitted for substantive purposes at trial. As we have found no error in excluding this evidence, the trial court did not err in failing to instruct the jury on a theory unsupported by the evidence. This assignment of error is overruled.

## V. Peremptory Strikes of Black Jurors

[3] Defendant argues that the trial court erred in allowing the State to strike jurors based upon their race. Defendant objected to each peremptory challenge against a prospective black juror lodged by the district attorney. The trial court rejected defendant's first seven objections and ruled that defendant had failed to establish a *prima facie* case of racial discrimination. After the prosecutor used a peremptory challenge against the eighth black juror, the trial court required the district attorney to state his reasons for use of the challenges and held that defendant had made a *"prima facia* [sic]" showing of peremptory excusals against prospective black jurors. The trial court entered special findings of fact and concluded that the reasons "proffered by the State for its excusal of each of the eight minority jurors excused by the State . . . are acceptable, non-pretextual, race-neutral, and gender neutral." At this time, "the [S]tate ha[d] accepted three minority jurors out of the eleven that ha[d] been selected." The final jury was comprised of three black women, two non-black women, and seven non-black men. Defendant argues that the trial court's late inquiry and decision did not remedy the discriminatory effect of the State's challenges.

"The Sixth Amendment to the United States Constitution prohibits the arbitrary exclusion of certain groups or classes of citizens

from the jury in federal and state cases." *State v. Cole*, 343 N.C. 399, 414, 471 S.E.2d 362, 369 (1996), *cert denied*, 519 U.S. 1064, 136 L. Ed. 2d 624 (1997), *cert. denied*, 356 N.C. 683, 577 S.E.2d 900 (2003); U.S. Const. amend. VI. North Carolina's Constitution expressly provides that "[n]o person shall be excluded from jury service on account of sex, race, color, religion, or national origin." N.C. Const. art I, § 26.

We apply the test set forth by the United States Supreme Court in *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69 (1986) to evaluate whether individuals were impermissibly excluded from jury service. Our Supreme Court has stated the *Batson* analysis as follows:

> First, defendant must establish a *prima facie* case that the peremptory challenge was exercised on the basis of race. Second, if such a showing is made, the burden shifts to the prosecutor to offer a racially neutral explanation to rebut defendant's *prima facie* case. Third, the trial court must determine whether the defendant has proven purposeful discrimination.

*State v. Cummings*, 346 N.C. 291, 307-8, 488 S.E.2d 550, 560 (1997), *cert. denied*, 522 U.S. 1092, 139 L. Ed. 2d 873 (1998). The first step of the *Batson* analysis " 'is not intended to be a high hurdle for defendants to cross. Rather, the showing need only be sufficient to shift the burden to the State to articulate race-neutral reasons for its peremptory challenge.' " *State v. Barden*, 356 N.C. 316, 345, 572 S.E.2d 108, 128 (2002), *cert. denied*, 538 U.S. 1040, 155 L. Ed. 2d 1074 (2003) (quoting *State v. Hoffman*, 348 N.C. 548, 553, 500 S.E.2d 718, 722 (1998)). Regarding the second step on the *Batson* analysis, the law "does not demand [a race-neutral] explanation that is persuasive, or even plausible. 'At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.' " *Purkett v. Elem*, 514 U.S. 765, 768, 131 L. Ed. 2d 834, 839, *reh'g denied*, 515 U.S. 1170, 132 L. Ed. 2d 874 (1995) (quoting *Hernandez v. New York*, 500 U.S. 352, 360, 114 L. Ed. 2d 395, 406 (1991)). At "the third step . . . persuasiveness of the justification becomes relevant . . . the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination." *Id.*, (citing *Batson*, 476 U.S. at 98, 90 L. Ed. 2d at 88-89).

Although *Batson* is usually applied in the context of racial discrimination, we have extended the *Batson* analysis to the issue of gender discrimination in jury selection. See *State v. Call*, 349 N.C.

382, 403, 508 S.E.2d 496, 510 (1998), *cert. denied*, 534 U.S. 1046, 151 L. Ed. 2d 548 (2001) (holding that gender discrimination claims require a party to show a *prima facie* showing of intentional discrimination prior to requiring the prosecutor to explain the basis of the challenge and utilizing "the same type of factors which may be relevant in determining whether a *Batson* violation has occurred").

In analyzing the jury selection process where a *Batson* challenge is raised, an appellate court looks to the following non-exclusive factors:

(1) the characteristic in question of the defendant, the victim and any key witnesses;

(2) questions and comments made by the prosecutor during jury selection which tend to support or contradict an inference of discrimination based upon the characteristic in question;

(3) the frequent exercise of peremptory challenges to prospective jurors with the characteristic in question that tends to establish a pattern, or the use of a disproportionate number of peremptory challenges against venire members with the characteristic in question;

(4) whether the State exercised all of its peremptory challenges; and,

(5) the ultimate makeup of the jury in light of the characteristic in question.

*See generally, Call*, 349 N.C. at 404, 508 S.E.2d at 510 (1998); *State v. Gaines*, 345 N.C. 647, 671, 483 S.E.2d 396, 410, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997) (regarding gender); *State v. Nicholson*, 355 N.C. 1, 22, 558 S.E.2d 109, 125, *cert. denied*, 537 U.S. 845, 154 L. Ed. 2d 71 (2002) (regarding race).

Our review accords deference to the trial court's ultimate determination because the findings largely "turn on [an] evaluation of credibility[.]" *Batson*, 476 U.S. at 98 n.21, 90 L. Ed. 2d at 89 n.21; *State v. Norwood*, 344 N.C. 511, 476 S.E.2d 349, *cert. denied*, 520 U.S. 1158, 137 L. Ed. 2d 500 (1996). The trial court's *Batson* decision "will be upheld unless the appellate court is convinced that the trial court's determination is clearly erroneous." *State v. Fletcher*, 348 N.C. 292, 313, 500 S.E.2d 668, 680 (1998), *cert. denied*, 525 U.S. 1180, 143 L. Ed. 2d 113 (1999). With these principles in mind, we turn to defendant's assertions concerning jury selection.

## A. Racial Discrimination

Defendant asserts the trial court erred by finding the prosecutor did not intentionally discriminate on the basis of race. The trial court found defendant had made a *prima facie Batson* challenge to satisfy the first prong of the analysis. *State v. Smith*, 328 N.C. 99, 400 S.E.2d 712 (1991). We review the second prong of *Batson*, the prosecutor's proffered reasons for striking the jurors, and the third prong of *Batson*, whether the trial court properly found these reasons were not pretextual and the defendant failed to prove intentional discrimination. *State v. Fair*, 354 N.C. 131, 557 S.E.2d 500 (2001), *cert. denied*, 535 U.S. 1114, 153 L. Ed. 2d 162 (2002).

The prosecutor offered race-neutral explanations for striking each of the eight black jurors. The prosecutor stated he used a peremptory challenge against Mr. Farmer because he has a son who is the same age as defendant. The State was concerned Farmer would be overly sympathetic. Mr. Farmer also works as a detention officer, has had contact with defendant and several witnesses, has been supervised by one of the witnesses, and such supervision may re-occur in the future. Regarding Ms. McNeal, the prosecutor noted she was equivocal on the death penalty. Mr. Lee was challenged because counsel for the defendant had represented Lee within the past two years. Lee also appeared to suffer memory problems because he did not remember that defendant's counsel had represented him. Reverend Bethune gave equivocal responses on the death penalty and participated in a prison ministry. Ms. Maxwell was a convicted felon, stated that it would be hard for her to follow the law, and gave equivocal responses on the death penalty. Mr. Dobbins had a son the same age as defendant, knew and had played sports with some of the witnesses, was equivocal on the death penalty, and possessed an unstable employment history. Ms. Nimitz also has a son the same age as defendant. The prosecutor also believed that Nimitz was too authoritarian and might cause problems during deliberations. Finally, Ms. Cunningham was equivocal about the death penalty, articulated a higher standard of proof than that legally required, and stated that one of the witnesses is her doctor.

Defendant asserts these reasons, although facially race-neutral, were pretextual. Defendant argued at trial that other non-black jurors were not challenged despite being equivocal about the death penalty, articulating a higher standard of proof, having children who were defendant's age, or having had contact with some of the witnesses.

Defendant also noted that white jurors, who appeared authoritarian, were not challenged by the State.

In considering the third prong of *Batson*, we consider the race-neutral explanation by the prosecutor, the argument of pretext by defendant, and the factors our appellate courts have deemed relevant. First, defendant and the victims were black and the witnesses were both black and white. Second, the prosecutor made no comments during jury selection to support an inference of racial discrimination. Third, the prosecutor exercised nearly 73% (eight of twelve) of his peremptory challenges against black jurors. Fourth, the State failed to exercise all of its fourteen peremptory challenges against prospective members of the jury. Finally, the seated jury was composed of three black jurors and nine non-black jurors.

The only factor supporting an inference of discrimination is the disproportionate number of prospective black jurors peremptorily challenged by the State. We previously held that, where this factor is approximately 70% "but other elements supporting an inference are not present[,]" we will not overturn the trial court's decision that defendant failed to present a *prima facie* case of racial discrimination. *State v. Mays*, 154 N.C. App. 572, 577, 573 S.E.2d. 202, 206 (2002).

> In *State v. Smith*, 328 N.C. 99, 123, 400 S.E.2d 712, 725 (1991), "the State exercised 80% of the peremptories used to remove black potential jurors." There, the Court held defendant had established a prima facie *Batson* case by proving an inference of racial discrimination. In *Smith*, however, there was also a statement by the prosecutor that "tends to support . . . an inference of discrimination." *Id.* Moreover, the case "involved an interracial killing and attracted much attention," and the "racial emotions and publicity surrounding the case were substantial enough for the defendant to successfully seek a change of venue." *Smith*, 328 N.C. at 122, 400 S.E.2d at 725. As in *Smith*, defendant here was a young, African-American man, and the victims were both white. Unlike *Smith*, however, defendant's motion to change venue was denied, and publicity was such that many jurors had never heard of the case. Therefore, while the percentages of peremptory challenges were high in both cases, other elements supporting an inference are not present in the case at bar.

*Id.*

This Court in *Mays* addressed the trial court's determination of whether the defendant had established a *prima facie* case that peremptory challenges were exercised on the basis of race. Here, our review concerns the trial court's determination of whether the defendant has proven purposeful discrimination in the jury selection process. We conclude, as in *Mays*, that where the only factor supporting an inference of discrimination is the State's heightened use of peremptory challenges against prospective black jurors, and other elements relevant to finding an inference of discrimination are not present, the trial court's determination, that the State did not purposefully discriminate on the basis of race, is not "clearly erroneous."

### B.  Gender Discrimination

[4] Defendant demands a new trial and asserts (1) the trial court did not engage in a proper analysis of gender-based challenges and (2) that it failed to make an independent assessment of whether the challenges were motivated by gender. We disagree.

During arguments concerning peremptory challenges, the trial court stated "I don't think I have to find [the State's reason for peremptorily striking a potential juror is] a valid reason. I don't even have to agree with it. I just have to find that it is acceptable, non-pretextual. . . . And, non-racial and non-gender bias." The issue of gender bias was repeatedly brought to the court's attention during the process of jury selection. In its order concerning *Batson* issues, the trial court stated, "Defendant . . . failed to put forth a sufficient showing of purposeful discrimination on the basis of race or gender[.]" In its findings of fact, the trial court found the State had acted "substantially the same with regard to each juror, regardless of that juror's race or gender[.]" In its findings of fact, the trial court found the State had acted "substantially the same with regard to each juror, regardless of that juror's race or gender" in questions and actions towards all prospective jurors. After reviewing the totality of the circumstances, the trial court concluded as a matter of law that the "reason or reasons proffered by the State for its excusal of each [juror] . . . are acceptable, non-pretextual, race-neutral, and gender neutral." The court cited the justifications proffered by the State and considered by the court. The order clearly indicates that, in light of the State's rebuttal testimony, it accepted those justifications and concluded the State had acted in a gender neutral fashion. Defendant's argument, that the court did not adequately consider whether the challenges were motivated by gender, is overruled.

**STATE v. WIGGINS**

[159 N.C. App. 252 (2003)]

## C. Race-Gender Bias

The *Batson* inquiry remains the same whether the issue is race alone, or race in conjunction with gender. Purposeful discrimination against a cognizable group based on constitutionally-protected traits is prohibited. We consider whether individuals having the same race *and* gender have been singled out as a cognizable group.

Defendant and his victim-child are black males. The witnesses included male, female, black and white individuals. The prosecutor made no comments during jury selection which imply race-gender discrimination. While the prosecutor exercised only 33% (4 of 12) of his peremptory challenges against prospective black male jurors, every black male prospective juror not excused for cause was challenged. The State exercised only twelve of its fourteen allowed peremptory challenges against potential members of the jury. The final jury contained no black males.

The State's reasons for challenging the potential black male jurors included: (1) having a son the same age as defendant, (2) contact with witnesses, (3) prior representation by defense counsel, (4) memory problems regarding prior representation by defense counsel, (5) equivocal responses on the death penalty, (6) prison ministry experience, and (7) an unstable employment history. Defendant asserted these reasons were pretextual. Defendant's assertion is weaker here than regarding race alone because other jurors, who were not black males, were challenged for these same issues. All are non-discriminatory reasons for the State to challenge jurors. While the State challenged every potential black male juror, this amounted to only four of the State's fourteen peremptory challenges. Fewer challenges against a particular cognizable group makes it more difficult for a defendant to establish a pattern of strikes indicating that purposeful discrimination is the motivating factor. The absence of other factors to establish purposeful discrimination diminishes defendant's claim. In light of the evidence before and the inquiry by the trial court, we do not find that the court's determination that there was no purposeful discrimination against black males was "clearly erroneous." The *Batson* order of the trial court is affirmed.

## VI. Record of Numerical Division by Jury

[5] Defendant argues that the trial court committed plain error in asking the jury to record its numerical division and requiring further deliberations. This argument is not supported by a correlating assign-

ment of error in the record on appeal. Defendant moved this Court to amend the record on appeal to include a correlating assignment of error. We do not find that a late amendment prejudices the State. The issue is addressed and argued in both briefs. We allow defendant's motion in the interest of justice.

Defendant failed to object to the trial court's administrative instruction and argues the instruction to the jury constitutes plain error. Plain error review is appropriate where defendant alleges the trial court erred in instructing the jury or admitting evidence. *State v. Greene*, 351 N.C. 562, 566, 528 S.E.2d 575, 578, *cert. denied*, 531 U.S. 1041, 148 L. Ed. 2d 543 (2000).

A totality of the circumstances test determines whether an inquiry into the jury's numerical division is coercive or whether the inquiry affected the jury's decision. *State v. Yarborough*, 64 N.C. App. 500, 502, 307 S.E.2d 794, 795 (1983). The trial court did not ask the jury for their numerical split, but requested they keep an internal record of the votes. The trial court re-instructed the jury after making this request, reminded them that they should continue to deliberate, while remaining true to their convictions, and stated, "none of you should surrender your honest conviction as to the weight or the affect (sic) of the evidence, solely because of the opinion of your fellow jurors; or for the mere purpose of returning a verdict." Given the totality of the circumstances and substance of the instruction, no plain error was committed by the trial court.

## VII. Sentencing Factors

Defendant argues that the trial court erred in finding evidence of the statutory aggravating factor of "took advantage of a position of trust or confidence" and in not finding the mitigating factors of aid in apprehension of felon, defendant's support of his family, and presence of an extensive support system in the community.

## A. Aggravating Factor

[6] Defendant argues that his relationship with the victim did not foster trust and confidence between them. Defendant contends that nothing leading up to, during, or after the shooting suggested it was accomplished through an abuse of trust. We disagree. But for the relationship between defendant and the victim, the victim would not have been following the defendant and would not have been forced to stop on a residential two-lane road just after midnight. The co-defendants would not have had the opportunity to "box" the victim's

car from behind, pull beside the victim's vehicle, and shoot her while defendant's vehicle blocked her from the front. The crimes against the victim could not have been carried out without the active participation of defendant and the trusting relationship between defendant and the victim, who was following him to her home.

Although these factors square completely with the commission of the crime, our Court has found the existence of an aggravating factor of taking advantage of trust and confidence in very limited circumstances. *State v. Marecek,* 152 N.C. App. 479, 514, 568 S.E.2d 237, 259 (2002). *See also, State v. Rogers,* 157 N.C. App. 127, 130, 577 S.E.2d 666, 669 (2003).

> *See, e.g., State v. Farlow,* 336 N.C. 534, 444 S.E.2d 913 (1994) (factor properly found where nine-year-old victim spent great deal of time in adult defendant's home and essentially lived with defendant while mother, a long-distance truck driver, was away); *State v. Arnold,* 329 N.C. 128, 404 S.E.2d 822 (1991) (factor properly found in husband-wife relationship); *State v. Potts,* 65 N.C. App. 101, 308 S.E.2d 754 (1983), *disc. review denied,* 311 N.C. 406, 319 S.E.2d 278 (1984) (factor properly found where defendant shot best friend who thought of defendant as a brother); *State v. Baucom,* 66 N.C. App. 298, 311 S.E.2d 73 (1984) (factor properly found where adult defendant sexually assaulted his ten-year-old brother); *State v. Stanley,* 74 N.C. App. 178, 327 S.E.2d 902, *disc. review denied,* 314 N.C. 546, 335 S.E.2d 318 (1985) (factor properly found where defendant raped nineteen-year-old mentally retarded female who lived with defendant's family and who testified that she trusted and obeyed defendant as an authority figure).

*Id.* The relationship of husband and wife does not *per se* support a finding of trust or confidence where "[t]here was no evidence showing that defendant exploited his wife's trust in order to kill her." *Marecek* at 514, 568 S.E.2d at 259.

The State presented evidence through Candace that defendant had tried to be "nice" to the victim by going to doctor appointments with her. The victim was surprised, but seemed happy, that defendant wanted her to follow him to her apartment after retrieving her car. The evidence, when considered in conjunction with the manner in which the crime was carried out and the pretext of going to the victim's home, establishes the aggravating factor of abuse of "a position of trust or confidence" by a preponderance of evidence.

Defendant contends the evidence also shows that the victim knew defendant was romantically involved with other women. While this information might preclude the victim from believing defendant's faithfulness as her boyfriend, it would not cause the victim to be in doubt for the safety of her life and that of her unborn child around defendant, the father of that unborn child. This assignment of error is overruled.

## B. Mitigating Factors

[7] Defendant contends the trial court erred in failing to find three statutory mitigating factors that defendant: (1) "aided in the apprehension of another felon," (2) "supports the defendant's family," and (3) "has a support system in the community."

"The burden is on the defendant to establish a mitigating factor by a preponderance of the evidence." *Marecek*, 152 N.C. App. at 513, 568 S.E.2d at 259. The trial court must find a mitigating factor where evidence to support the factor is substantial, credible, and uncontradicted. *State v. Jones*, 309 N.C. 214, 218-19, 306 S.E.2d 451, 454 (1983). To establish error on appeal, defendant "must show that the evidence so clearly establishes the fact in issue that no reasonable inferences to the contrary can be drawn and that the credibility of the evidence [to support the mitigating factor] is manifest as a matter of law." *State v. Hughes*, 136 N.C. App. 92, 100, 524 S.E.2d 63, 68 (1999), *disc. review denied*, 351 N.C. 644, 543 S.E.2d 878 (2000) (quoting *State v. Jones*, 309 N.C. 214, 219-20, 306 S.E.2d 451, 455 (1983)).

Defendant's evidence does not meet the required standard. Defendant gave the police the telephone number and hotel room at the Villager Lodge where Watkins, the shooter, was staying on 24 November 1999. Evidence indicated that defendant had previously lied to police and cooperated only after being pressed by police. In *State v. Brown*, 314 N.C. 588, 595-96, 336 S.E.2d 388, 392-93 (1985), our Supreme Court stated that whatever consideration defendant earned by helping the police was offset by his earlier denials of wrongdoing, and held the trial court had not abused its discretion in failing to find an early acknowledgment factor. The trial court did not err in failing to find this mitigating factor at bar.

As to the mitigating factors that defendant supported his family and had a support system in the community, we find no error in the trial court's failure to find either mitigating factor. Evidence regarding defendant's support for his family was contradicted. Defendant

pays child support for his illegitimate son in California, but has not done so voluntarily. Evidence was presented that defendant wanted to eliminate the victim and her baby to avoid paying additional child support. That defendant provides money to various family members is not *per se* sufficient where there was evidence that defendant did not voluntarily provide other means of support, and a possible motive for the crimes was to avoid paying support.

Regarding defendant's community support system,

[t]estimony demonstrating the existence of a large family in the community and support of that family alone is insufficient to demonstrate the separate mitigating factor of a community support system. One witness' conclusory testimony as to the existence of a support structure is unsubstantial and insufficient to clearly establish the factor and does not compel a finding of the mitigating factor.

*State v. Kemp*, 153 N.C. App. 231, 241-42, 569 S.E.2d 717, 723, *disc. review denied*, 356 N.C. 441, 573 S.E.2d 158 (2002). Although defendant presented evidence that he had "many friends" in Charlotte who liked and cared for him, defendant failed to show the existence of a "support system in the community." This assignment of error is overruled.

## VIII.  Conclusion

We hold that any error in the trial court's admission of the victim's written statements as present sense impressions was harmless beyond a reasonable doubt. Defendant's remaining assignments of error are overruled.

No prejudicial error.

Chief Judge EAGLES and Judge CALABRIA concur.