IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA17-1255

 Filed: 17 July 2018

Cumberland County, No. 10 CRS 63629

STATE OF NORTH CAROLINA

 v.

CEDRIC THEODIS HOBBS, JR.

 Appeal by defendant from judgments entered 18 December 2014 by Judge

Robert F. Floyd in Cumberland County Superior Court. Heard in the Court of

Appeals 7 June 2018.

 Attorney General Joshua H. Stein, by Special Deputy Attorney General Amy
 Kunstling Irene, for the State.

 Appellate Defender Glenn Gerding, by Assistant Appellate Defender Sterling
 Rozear, for defendant-appellant.

 TYSON, Judge.

 Cedric Theodis Hobbs, Jr. (“Defendant”) appeals from a jury’s guilty verdicts,

convicting him of first-degree murder, robbery with a dangerous weapon, attempted

robbery with a dangerous weapon, and conspiracy to commit robbery with a

dangerous weapon. We find no error.

 I. Background

 Rondriako Burnett was murdered on 5 November 2010 in or around Thomson,

Georgia. Keon, Burnett’s brother, testified that the last time he had seen his brother
 STATE V. HOBBS

 Opinion of the Court

alive was that afternoon when he had left with Defendant, who was riding in

Burnett’s red Suburban SUV. The next morning, Burnett’s sister received a call

informing her that a body, later confirmed to be Burnett, had been found. Burnett’s

red Suburban SUV was not found with his body. A .380-caliber bullet was recovered

from Burnett’s body during the autopsy.

 On the morning of 6 November 2010, Kyle Harris and Demarshun Sanders,

were working at Cumberland Pawn Shop, located in a small shopping center in

Fayetteville, North Carolina. At approximately 8:45 a.m., Sanders observed

Defendant and a woman sitting inside of a red SUV in the parking lot of the center.

Shortly thereafter, around 9:00 a.m., Defendant entered the store to pawn a CD

player. Harris told Defendant he would not accept the CD player because it was not

working. Subsequently, Defendant returned to the store seeking to pawn car

speakers. He told Harris that his SUV was broken down and he needed help. Upon

hearing Defendant’s reasoning, Harris agreed to accept the speakers and paid

Defendant $45.00. The red SUV remained parked in the parking lot for the rest of

the day and was observed there by several employees and customers.

 Later that evening, Harris, Derrick Blackwell, and Sean Collins were working

inside the pawn shop when Defendant re-entered, carrying a backpack. Defendant

was accompanied by the woman previously seen inside the red SUV, later identified

 -2-
 STATE V. HOBBS

 Opinion of the Court

as Alexis Mattocks, who was carrying a suitcase. Defendant and his companion

casually browsed the store, while the employees played video games on their laptops.

 Defendant pulled a gun, identified as a silver-chromed Lorcin .380 caliber

handgun, and pointed it at all three employees. Defendant told the employees to

empty their pockets, demanded their phones, wallets, and keys, and for the cash

register be emptied.

 To fulfill Defendant’s request, Harris began walking toward the cash register.

Defendant pulled the trigger and shot Harris in the upper chest. Defendant then

walked behind the counter, pointed the gun at Blackwell, and instructed him to

empty the cash register. After taking the money inside the register, Defendant

directed his attention to Collins, who was instructed to empty his pockets. Collins

complied, and threw the contents of his pockets on the ground towards Defendant.

Defendant took money off the floor and proceeded to grab the wounded Harris’ car

keys from his belt loop.

 Defendant exited the store and moved some items from the red SUV, later

confirmed to be Burnett’s stolen Suburban, and drove off in Harris’ silver colored

Saturn Ion. When first responders arrived on the scene, Harris was unresponsive.

Harris died from the injuries resulting from the gunshot wound.

 On the night of 6 November 2010, Washington, D.C. Police Officer Jerry Reyes

observed a Saturn Ion bearing a North Carolina license plate. Officer Reyes checked

 -3-
 STATE V. HOBBS

 Opinion of the Court

the plate, learned the vehicle was stolen, and began pursuit. When back-up officers

arrived, Officer Reyes executed a traffic stop. There were three people inside the car:

Defendant, who was driving, Mattox, and their young child. Officer Reyes pulled

Defendant out of the car, handcuffed and arrested him.

 The Washington, D.C. Police learned an occupant of the stolen Saturn was a

“person of interest” in connection with a robbery/homicide in Fayetteville, North

Carolina, and contacted the Fayetteville Police Department. After verifying

Defendant was the “person of interest” and seeing blood located on Defendant’s shoes,

Washington D.C. Police obtained a search warrant for the Saturn. The subsequent

search recovered a .380-caliber Lorcin handgun. The bullets removed from the bodies

of Rondriako Burnett and Kyle Harris matched with a test shot later fired from the

recovered Lorcin .380-caliber handgun.

 The Fayetteville Police Department obtained North Carolina warrants, and

Detective Sondergaard traveled to Washington D.C. to interview Defendant.

Defendant stated his purpose for the robbery was to get “[m]oney and guns” and he

had fired his weapon to “scare” the employees of the pawn shop, but he “wasn’t trying

to shoot” Harris.

 On 4 August 2014, Defendant was indicted for first-degree murder, first-degree

kidnapping, two counts of second-degree kidnapping, two counts of robbery with a

dangerous weapon, two counts of attempted robbery with a dangerous weapon, and

 -4-
 STATE V. HOBBS

 Opinion of the Court

conspiracy to commit robbery with a dangerous weapon. Defendant gave notice to

assert the defenses of mental infirmity, diminished capacity, and automatism.

 A capital first-degree murder trial and for the other related charges

commenced against Defendant. At the close of the State’s evidence, Defendant moved

to dismiss all charges. The court dismissed the three kidnapping charges, but denied

Defendant’s motion to dismiss any of the remaining charges.

 Defendant did not testify at trial, but presented evidence of his background

though the testimony of various family members, and evidence of his mental health

through expert witnesses. The testimony of his family members stated Defendant

had survived a troubled childhood. He had lived in bad neighborhoods where drive-

by shootings were frequent, and drug use and violence were present. His father

abused alcohol and drugs during Defendant’s childhood and adolescence. His mother

abused Defendant by spanking him repeatedly. Defendant’s mother was described

as “different” and “real strange” by Defendant’s aunts.

 Abandoned by his parents, Defendant went to live with his aunt and uncle,

who suffered through many evictions and also lived in crime-ridden neighborhoods.

Even though Defendant was described as a bright student, his behavior and

performance began to change drastically in high school. In 1997, Defendant was

arrested for armed robbery and was placed into a drug treatment program.

Defendant lost interest in the marching band, his grades began to drop, and his

 -5-
 STATE V. HOBBS

 Opinion of the Court

absences from school increased. His probation was revoked and he served time in

prison. After meeting Alexis Mattocks, and after the birth of their daughter,

Defendant was described as beginning to turn his life around.

 Defendant returned to Georgia in August 2010 after residing in Washington,

D.C. for several years, when his family was evicted from their home. A couple of

months after moving back to Georgia, Defendant relapsed into drug use and bought

drugs from Rondriako Burnett.

 Dr. Ginger Calloway, a psychologist, testified regarding Defendant’s and his

parents’ prior mental health diagnoses and Defendant’s substance abuse. Dr.

Calloway asserted Defendant’s background and experiences were all influential on

Defendant’s actions at the time of the murders.

 Defendant told Dr. Calloway he had routinely carried a gun when he lived in

D.C. because of the violence, began committing robberies in 1997 to obtain money,

and he had used and sold drugs. He also stated to Dr. Calloway he had not intended

to kill Harris.

 Dr. George Corvin, a psychiatrist, testified about his diagnoses of Defendant,

which included persistent depressive disorder, post-traumatic stress disorder,

multiple substance abuse disorder, and characteristics of borderline personality

disorder and paranoid personality disorder. Dr. Corvin opined that Defendant’s

mental abilities were affected by mental illness at the time of the offenses.

 -6-
 STATE V. HOBBS

 Opinion of the Court

 Defendant told Dr. Corvin he had relapsed and began using cocaine again

approximately two weeks before the offenses. Defendant also told Dr. Corvin that

the day before he shot Burnett, he and Burnett had engaged in an altercation over

money. Burnett had shot a gun into the air, which startled Defendant, upset

Mattocks, and made their baby cry. Defendant shot Burnett the next day and stated

he was mad at Burnett and wanted to kill him.

 Dr. Corvin testified that he understood Defendant had taken Mattocks and

their baby out of Georgia, because Defendant’s family had been talking about taking

the baby away from them. They hid Burnett’s SUV until after dark, then drove to

Fayetteville, North Carolina, to the Cumberland Pawn Shop.

 Once there, the vehicle would not start, and they came up with a plan to rob

the pawn shop. They bought duct tape and planned to have Defendant hold the gun.

Mattocks was to restrain the employees with the duct tape, take money and guns

from the pawn shop, steal Harris’ Saturn, and then they would drive to Washington,

D.C. to sell the guns.

 Dr. Corvin stated Defendant had told him that he did not intend to hurt anyone

during the robbery, and displayed remorse for killing Harris, but not for killing

Burnett, who Defendant thought was a “very bad person.” Dr. Corvin opined

Defendant’s ability to think, reason, and make judgments was compromised at the

 -7-
 STATE V. HOBBS

 Opinion of the Court

time of the robbery. Dr. Corvin stated while Defendant did plan and intended the

robbery, he personally doubted Defendant had intended to kill Harris.

 Based upon the evidence presented, defense counsel made three written

requests for jury instructions at the charge conference. Defense counsel proposed

instructions on: (1) first-degree murder with premeditation and deliberation; (2) lack

of mental capacity; and (3) deliberation. The trial court denied the requests for

deliberation and first-degree murder with premeditation and deliberation. The court

indicated that these proposed instructions were covered in substance in the pattern

jury instructions, but granted defense counsel’s request for a proposed instruction on

lack of mental capacity.

 The jury found Defendant guilty of all charges, including first-degree murder

on both the basis of premeditation and deliberation and under the felony murder rule.

The jury deadlocked 11-to-1 in favor of a capital sentence. The trial judge sentenced

Defendant to life imprisonment without parole for the first-degree murder conviction,

consolidated with one of the attempted robbery with a dangerous weapon convictions,

followed by consecutive sentences on each of the remaining convictions. Defendant

filed timely notice of appeal.

 II. Jurisdiction

 An appeal of right lies with this court from a final judgment of the superior

court pursuant to N.C. Gen. Stat. §§ 7A-27(b)(1) and 15A-1444(a) (2017).

 -8-
 STATE V. HOBBS

 Opinion of the Court

 III. Issues

 Defendant argues the trial court erred when it denied defense counsel’s

proffered jury instructions and denied Defendant’s first three Batson challenges.

 IV. Jury Instructions

 A. Standard of Review

 This Court has recognized “the proper standard of review depends upon the

nature of a defendant’s request for a jury instruction.” State v. Edwards, 239 N.C.

App. 391, 392, 768 S.E.2d 619, 620 (2015). Defendant argues the standard of review

for this issue is de novo, and cites State v. Osorio, 196 N.C. App. 458, 466, 675 S.E.2d

144, 149 (2009).

 The issue in Osorio was whether sufficient evidence existed to support a jury

instruction on acting in concert. Id. “Whether evidence is sufficient to warrant an

instruction . . . is a question of law[.]” State v. Cruz, 203 N.C. App. 230, 242, 691

S.E.2d 47, 54 (2010). We review questions of law de novo. Edwards, 239 N.C. App. at

393, 768 S.E.2d at 621 (citation omitted).

 Where the issue is not a question of law or reviewed de novo, the appropriate

standard of review is for an abuse of discretion. State v. Lewis, 346 N.C. 141, 145, 484

S.E.2d 379, 381 (1997) (“[w]hether the trial court instructs using the exact language

requested by counsel is a matter within its discretion and will not be overturned

absent a showing of abuse of discretion.”) (quoting State v. Herring, 322 N.C. 733,

 -9-
 STATE V. HOBBS

 Opinion of the Court

742, 370 S.E.2d 363, 369 (1988)); State v. Shepherd, 156 N.C. App. 603, 607, 577

S.E.2d 341, 344 (2003) (“the choice of instructions given to a jury ‘is a matter within

the trial court’s discretion and will not be overturned absent a showing of abuse of

discretion.’”) (quoting State v. Nicholson, 355 N.C. 1, 66, 558 S.E.2d 109, 152, cert.

denied, 537 U.S. 845, 154 L. Ed. 2d 71 (2002)).

 As the issue here involves the judge’s choice in the instructions given to the

jury, we review the trial court’s ruling for an abuse of discretion. See Lewis, 346 N.C.

at 145, 484 S.E.2d at 381.

 B. Abuse of Discretion

 “This Court has consistently held that a trial court is not required to give a

[defendant’s] requested instruction verbatim. Rather, when the [defendant’s] request

is correct in law and supported by the evidence, the court must give the instruction

in substance.” State v. Wallace, 351 N.C. 481, 525, 528 S.E.2d 326, 353 (2000) (citation

and internal quotation marks omitted). This rule applies even when the requested

instructions are based on language from opinions of the Supreme Court of North

Carolina. State v. Harden, 344 N.C. 542, 555, 476 S.E.2d 658, 664 (1996), cert. denied,

520 U.S. 1147, 137 L. Ed. 2d 483 (1997).

 The additional jury instructions defense counsel proffered all relate to the

mental and/or emotional condition of Defendant at the time of the murder and

whether Defendant had the mental capacity to consider the consequences of his

 - 10 -
 STATE V. HOBBS

 Opinion of the Court

actions. Such language is present in the Pattern Jury Instructions. Defendant has

failed to show the trial court abused its discretion in denying Defendant’s additional

language, the substance of which was included in the jury instructions the trial court

gave. See Wallace, 351 N.C. at 525, 528 S.E.2d at 353; see also State v. Jones, 342

N.C. 628, 632-33, 467 S.E.2d 233, 235 (1996).

 Further, the trial court allowed and gave Defendant’s proposed instruction on

lack of mental capacity. This instruction informed the jury that “[i]f, as a result of

post-traumatic stress disorder, persistent depressive disorder, or some other mental

infirmity, the defendant did not have the specific intent to kill, formed after

premeditation and deliberation, he is not guilty of first degree murder.” The jury was

clearly instructed concerning their ability to consider Defendant’s mental illnesses

and condition as part of their deliberation.

 Finally, Defendant was found guilty of first-degree murder based upon

premeditation and deliberation and under the felony murder rule. Presuming,

arguendo, the trial court erred by denying Defendant’s requested instructions, such

error would not be prejudicial. See State v. Farmer, 333 N.C. 172, 194, 424 S.E.2d

120, 133 (1993) (finding that where the defendant was convicted of first-degree

murder under both the felony murder rule and the theory of premeditation and

deliberation, “it would not have been reversible error for the trial court to have failed

to give any instructions concerning premeditation and deliberation.”).

 - 11 -
 STATE V. HOBBS

 Opinion of the Court

 V. Batson Challenges

 Defendant challenges the State’s exclusion of potential jurors, who are the

same race as Defendant, by the State’s use of peremptory challenges under Batson v.

Kentucky, 476 U.S. 79, 90 L. Ed. 2d 69 (1986).

 A. Standard of Review

 Defendant cites Piedmont Triad Regional Water Authority v. Sumner Hills,

Inc., 353 N.C. 343, 348, 543 S.E.2d 844, 848 (2001), to support his assertion that this

issue should be reviewed de novo, as it presents a constitutional question. However,

in ruling on criminal cases involving Batson challenges, the Supreme Court of North

Carolina has upheld “the trial court’s determination unless [the Court was] convinced

it is clearly erroneous.” State v. Golphin, 352 N.C. 364, 427, 533 S.E.2d 168, 211

(2000), cert. denied, 532 U.S. 931, 149 L. Ed. 2d 305 (2001) (citing State v. Kandies,

342 N.C. 419, 434-35, 467 S.E.2d 67, 75, cert. denied, 519 U.S. 894, 136 L. Ed. 2d 167

(1996)); State v. Lawrence, 352 N.C. 1, 14, 530 S.E.2d 807, 816 (2000) (‘“Where there

are two permissible views of the evidence, the factfinder’s choice between them cannot

be clearly erroneous’”) (quoting State v. Thomas, 329 N.C. 423, 433, 407 S.E.2d 141,

148 (1991)). “When the trial court explicitly rules that a defendant failed to make out

a prima facie case, review by this Court is limited to whether the trial court’s finding

was error.” Golphin, 352 N.C. at 426, 533 S.E.2d at 211.

 B. Three-Prong Batson Test

 - 12 -
 STATE V. HOBBS

 Opinion of the Court

 “In Batson the United States Supreme Court set out a three-pronged test to

determine whether a prosecutor impermissibly excluded prospective jurors on the

basis of their race.” State v. Bonnett, 348 N.C. 417, 433, 502 S.E.2d 563, 574 (1998)

(citing Hernandez v. New York, 500 U.S. 352, 358-59, 114 L. Ed. 2d 395, 405 (1991)),

cert. denied, 525 U.S. 1124, 142 L. Ed. 2d 907 (1999).

 “First, the defendant must make a prima facie showing that the state exercised

a peremptory challenge on the basis of race.” State v. Fair, 354 N.C. 131, 140, 557

S.E.2d 500, 509 (2001) (citing Lawrence, 352 N.C. at 14, 530 S.E.2d at 815). This

showing is “based on all relevant circumstances, such as defendant’s race, the victim’s

race, the race of key witnesses, questions and statements of the prosecutor which

tend to support or refute an inference of discrimination, a pattern of strikes against

minorities, or the State’s acceptance rate of prospective minority jurors.” State v.

White, 349 N.C. 535, 548, 508 S.E.2d 253, 262 (1998) (citation omitted). Numerical

analysis of the accepted and dismissed jurors of a particular race is not dispositive

proof of discrimination, but it “can be useful in helping us and the trial court

determine whether a prima facie case of discrimination has been established.” State

v. Barden, 356 N.C. 316, 344, 572 S.E.2d 108, 127 (2002).

 “The first step of the Batson analysis is not intended to be a high hurdle for

defendants to cross. Rather, the showing need only be sufficient to shift the burden

to the State to articulate race-neutral reasons for its peremptory challenge.” State v.

 - 13 -
 STATE V. HOBBS

 Opinion of the Court

Wiggins, 159 N.C. App. 252, 262, 584 S.E.2d 303, 311-12 (2003) (citation and internal

quotation marks omitted), cert. denied, 541 U.S. 910, 158 L. Ed. 2d 256 (2004).

 If a prima facie showing is made by a defendant,

 the burden shifts to the State to articulate a race-neutral
 reason for striking the particular juror. The State’s
 explanation must be clear and reasonably specific, but does
 not have to rise to the level of justifying a challenge for
 cause. Moreover, unless a discriminatory intent is inherent
 in the prosecutor’s explanation, the reason offered will be
 deemed race neutral.

Golphin, 352 N.C. at 426, 533 S.E.2d at 211 (citations and internal quotation marks

omitted). A defendant may “submit evidence to show that the state’s proffered reason

is merely a pretext for discrimination.” Fair, 354 N.C. at 140, 557 S.E.2d at 509.

 Finally,

 the trial court must decide whether the defendant has
 proven purposeful discrimination. This involves weighing
 various factors such as susceptibility of the particular case
 to racial discrimination, whether the State used all of its
 peremptory challenges, the race of witnesses in the case,
 questions and statements by the prosecutor during jury
 selection which tend to support or refute an inference of
 discrimination, and whether the State has accepted any
 African-American jurors.

Id. (citations and internal quotation marks omitted).

 Upon review, this Court considers several non-exclusive factors:

 (1) the characteristic in question of the defendant, the
 victim and any key witnesses;

 (2) questions and comments made by the prosecutor during
 jury selection which tend to support or contradict an

 - 14 -
 STATE V. HOBBS

 Opinion of the Court

 inference of discrimination based upon the characteristic
 in question;

 (3) the frequent exercise of peremptory challenges to
 prospective jurors with the characteristic in question that
 tends to establish a pattern, or the use of a
 disproportionate number of peremptory challenges against
 venire members with the characteristic in question;

 (4) whether the State exercised all of its peremptory
 challenges; and,

 (5) the ultimate makeup of the jury in light of the
 characteristic in question.

Wiggins, 159 N.C. App. at 263, 584 S.E.2d at 312 (citations omitted).

 C. Trial Court’s Determination

 During voir dire, defense counsel raised four challenges to the jury venire

under Batson, and argued the State had exercised peremptory challenges to excuse

prospective jurors based upon their race. Three of these challenges are argued on

appeal: prospective jurors Robert Layden and Brian Humphrey, prospective juror

Curtis Landry, and prospective juror William McNeill. By failing to raise and argue

the fourth challenge on appeal, Defendant has abandoned his assertion of error to

this challenge. N.C.R. App. P. 28(a). We address each remaining challenge in turn.

 1. Jurors Layden and Humphrey

 For the first challenge, defense counsel asserted the State had used six out of

their eight peremptory challenges to excuse black jurors, even though the responses

 - 15 -
 STATE V. HOBBS

 Opinion of the Court

elicited from the excused black potential jurors were allegedly similar in substance

to white jurors who had remained in the pool.

 The trial court found Defendant had failed to make a prima facie showing.

However, the trial court improperly requested the State to articulate for the record

its reasons for challenging these prospective jurors. After hearing arguments, the

trial court reaffirmed its finding that Defendant had failed to make a prima facie

showing.

 Defendant argues that the trial court’s ruling became moot once the State gave

its reasons for its peremptory challenges. It is true that

 [i]f the prosecutor volunteers his reasons for the
 peremptory challenges in question before the trial court
 rules whether the defendant has made a prima facie
 showing or if the trial court requires the prosecutor to give
 his reasons without ruling on the question of a prima facie
 showing, the question of whether the defendant has made
 a prima facie showing becomes moot[.]

State v. Williams, 343 N.C. 345, 359, 471 S.E.2d 379, 386 (1996). However, if, as here,

the trial court rules the defendant did not make a prima facie showing, and merely

asks for the State’s reasoning underlying its decision to challenge “for the record,” the

issue is not moot. Id. at 359, 471 S.E.2d at 386-87. On this challenge, “our review is

limited to whether the trial court erred in finding that defendant failed to make a

prima facie showing.” Id. at 359, 471 S.E.2d at 387; State v. Smith, 351 N.C. 251, 262,

524 S.E.2d 28, 37 (2000) (“Where the trial court rules that a defendant has failed to

make a prima facie showing, our review is limited to whether the trial court erred in

 - 16 -
 STATE V. HOBBS

 Opinion of the Court

finding that defendant failed to make a prima facie showing, even if the State offers

reasons for its exercise of the peremptory challenges.”).

 In State v. Smith, the defendant made a Batson challenge after the State had

exercised six of its eight peremptory challenges to excuse black potential jurors. 351

N.C. at 262, 524 S.E.2d at 37. As here, the defendant in Smith did not assert his first

Batson challenge until after the State had exercised its eighth peremptory strike. Id.

351 N.C. at 263, 524 S.E.2d at 37. Where a defendant has not made any previous,

specific Batson challenge, the trial court has “no obligation to inquire into the reasons

for striking those [previously excused] jurors.” Id.

 “Although not dispositive, one factor tending to refute an allegation of

peremptory challenges being exercised on the basis of race is the acceptance rate of

black jurors by the prosecution.” Id. (citation omitted). At the time of Defendant’s

challenge, eleven black potential jurors were examined by the State, and the State

passed five, one of whom was later dismissed by the trial court for cause. Defendant

used two of five peremptory challenges to strike black jurors.

 At the time of Defendant’s first Batson challenge, the jury consisted of two

white males, two black males, and two white females. If Defendant had not used his

two peremptory strikes, the composition of the jury at the time of his first challenge

would have been four black jurors, three males and one female, and four white jurors.

 - 17 -
 STATE V. HOBBS

 Opinion of the Court

 As to the other factors, Defendant is black, and while the murder victim was

white, at least one of the other victims of the robbery was black. Further, key

witnesses relating to the homicide of Burnett in Georgia and Defendant’s arrest in

Washington, D.C. were black. After reviewing the record, “we also conclude that the

prosecutor did not make any racially motivated comments, nor did he ask racially

motivated questions of the black prospective jurors.” Id.

 Considering all the relevant factors, we conclude the trial court did not err in

finding Defendant had failed to establish a prima facie showing for prospective jurors

Layden and Humphrey. See White, 349 N.C. at 548, 508 S.E.2d at 262. Defendant’s

arguments are overruled.

 2. Juror Landry

 Defendant raised his second Batson challenge after the State had exercised its

ninth peremptory challenge. Defense counsel indicated that they “ha[d] nothing to

add” and renewed what they had “earlier said” in regards to the “general opposition

to why [they] needed to make a prima facie case.” The trial court noted the State had

used seven out of their nine peremptory challenges to excuse black prospective jurors

and, considering the previous facts cited, found Defendant had made a prima facie

showing and convened a hearing. After the hearing, Defendant’s Batson challenge

was denied.

 - 18 -
 STATE V. HOBBS

 Opinion of the Court

 When a trial court finds a defendant has made a prima facie showing, the first

prong of the analysis is satisfied. Wiggins, 159 N.C. App. at 264, 584 S.E.2d at 312

(citation omitted). We consider the State’s proffered reasoning for striking Landry,

and whether the trial court properly found these reasons were not pretextual. Id.

 The prosecutor asserted potential juror Landry was excused because: (1) he

believed drugs and alcohol can make people do things they did not want to do; (2) he

had mentored individuals with substance abuse issues in his church; (3) his uncle

had died in prison while serving two life sentences; (4) he had stated he believed a

life sentence was taking a life; (5) he had left several questions on the juror

questionnaire unanswered; (6) he had given some “perplexing” responses to

questions; (7) he had allegedly walked out of court once singing “the sun will come

out tomorrow”; (8) he had nodded affirmatively when another juror, who was excused

for cause, mentioned her religious belief against the death penalty; (9) he had

previously been in a gang and had heard Defendant was in a gang; (10) he had failed

to appear in court on previous occasions; and, (11) he had stated he would hold it

against the State if it did not present all the evidence.

 Defendant has failed to show any error in the trial court’s conclusion that the

State’s reasons for dismissing Landry were race-neutral. See State v. Bell, 359 N.C.

1, 13-16, 603 S.E.2d 93, 103-05 (2004) (valid and race-neutral reasons for excusing a

juror include: views on the death penalty, concern a juror might be unduly

 - 19 -
 STATE V. HOBBS

 Opinion of the Court

sympathetic to the defendant, work in prison ministry, and work with Alcoholics

Anonymous); see also State v. Robinson, 336 N.C. 78, 95, 443 S.E.2d 306, 313 (1994)

(not answering questions in a direct manner and confusing the meaning of questions

asked were valid and race-neutral reasons to excuse jurors).

 Defendant argues there were similar concerns with several of the white jurors

who the State did not strike but passed on to Defendant, and asserts the State did

not properly follow up with several of Landry’s responses to see if they would be a

problem. However, Defendant does not specify which white jurors had given similar

answers and were not excused. After a close reading of the record and transcript, we

do not find this argument to have merit. While some jurors had one factor in common

with Landry, none presented the range and multiplicity of issues the State stated for

challenging Landry.

 The combination of factors present with Landry’s answers and demeanor led

to his dismissal. Defendant cannot show disparate treatment “because the same

combination of factors was not present” in the white jurors whom the State passed.

Bell, 359 N.C. at 14, 603 S.E.2d at 104. Defendant fails to show any error in the trial

court’s denial of Defendant’s second Batson challenge of prospective juror Landry.

 3. Juror McNeill

 Defendant’s third Batson challenge was asserted after the State had exercised

its eleventh peremptory challenge. Defense counsel reiterated the same arguments

 - 20 -
 STATE V. HOBBS

 Opinion of the Court

previously asserted and reminded the court that Defendant had successfully

established a prima facie case based upon those grounds. After a hearing, the trial

court denied this Batson challenge.

 At the time of the third challenge, the State had used eight out of eleven

peremptory challenges to excuse black prospective jurors, and had passed on eight

black prospective jurors to Defendant. Two of those black jurors were seated on the

jury panel, one had been dismissed for cause, and five of those prospective black

jurors were struck by Defendant’s peremptory challenges.

 In support of its neutral justification, the State stated McNeill was excused

after he hesitated to reply when asked if he could vote to impose the death penalty,

and then stated he preferred life in prison over the death penalty. Further, he

disclosed he had family members with substance abuse issues, a sister with apparent

anxiety, and as a pastor, he had often counseled individuals with substance abuse

issues.

 As with the previous venireman, we conclude the State presented valid, race-

neutral reasons for excusing prospective juror McNeill. See Robinson, 336 N.C. at 97,

443 S.E.2d at 314 (finding a dismissal of a juror who stated a preference of life

imprisonment over the death penalty was “clear and reasonable”); see also State v.

Maness, 363 N.C. 261, 272, 677 S.E.2d 796, 804 (2009) (excusing a juror who had

 - 21 -
 STATE V. HOBBS

 Opinion of the Court

mental illness and who had worked with substance abusers, causing the State to fear

she would “overly identify with defense evidence” was valid and race-neutral).

 Defendant argues McNeill’s involvement with family and parishioner

substance abuse had occurred many years ago and he did not presently know anyone

with such issues. He further argues McNeill did state he could consider the death

penalty and that the State had passed white jurors who had issues with anxiety.

After a close reading of the record and transcript, we again do not find these

arguments persuasive. As with the previous venireman, it is the aggregate of race-

neutral factors identified by the State that led to McNeill’s challenge and dismissal.

Defendant has failed to show disparate treatment in this Batson challenge. See Bell,

359 N.C. at 14, 603 S.E.2d at 104.

 VI. Conclusion

 The trial court did not abuse its discretion in denying two of Defendant’s three

proposed jury instructions. The jury was provided the proposed instructions in

substance with the pattern jury instructions the trial court gave. See Wallace, 351

N.C. at 525, 528 S.E.2d at 353. Further, the trial court did instruct the jury on

Defendant’s proposed instruction on lack of mental capacity, fully alerting the jury to

their ability to consider Defendant’s asserted mental illness as part of the required

intent for first-degree murder. Finally, Defendant failed to show any reversible error,

where he was convicted of first-degree murder under both the theory of premeditation

 - 22 -
 STATE V. HOBBS

 Opinion of the Court

and deliberation and under the felony murder rule. See Farmer, 333 N.C. at 194, 424

S.E.2d at 133.

 After reviewing all the “relevant circumstances,” the trial court did not err in

concluding Defendant had failed to make a prima facie showing in his first Batson

challenge. See White, 349 N.C. at 548, 508 S.E.2d at 262. It is well established that

a disproportionate number of State’s peremptory challenges to dismiss prospective

jurors of a particular race is not dispositive of discrimination, but is one factor for the

Court to consider. Barden, 356 N.C. at 344, 572 S.E.2d at 127 (“We emphasize that a

numerical analysis of the type employed here is not necessarily dispositive. However,

such an analysis can be useful in helping us and the trial court determine whether a

prima facie case of discrimination has been established.”); Smith, 351 N.C. at 263,

524 S.E.2d at 37; Wiggins, 159 N.C. App. at 265, 584 S.E.2d at 313.

 An analysis of the peremptory challenges in this case goes against Defendant’s

argument. While the State, at the time of the last Batson challenge, had exercised

over seventy percent of its peremptory challenges for black jurors, the State

peremptorily challenged eight black prospective jurors and passed eight other black

prospective jurors to Defendant. One prospective black juror passed by the State was

struck by the trial court for cause. Defendant ultimately determined only two black

jurors were seated on the panel at the time of the third challenge, as he struck five

black potential jurors the State had passed to be seated.

 - 23 -
 STATE V. HOBBS

 Opinion of the Court

 Regarding the other two Batson challenges, the State presented valid, race-

neutral reasons for challenging the two jurors dismissed. Defendant failed to show

any purposeful discrimination. Fair, 354 N.C. at 140, 557 S.E.2d at 509. After

weighing all the factors considered by the trial court, Defendant has also failed to

show the trial court’s rulings were clearly erroneous. Golphin, 352 N.C. at 427, 533

S.E.2d at 211.

 Defendant received a fair trial, free from prejudicial errors. Defendant’s

arguments are overruled. We find no error in the jury’s verdicts or the judgments

entered thereon. It is so ordered.

 NO ERROR.

 Judges DIETZ and BERGER concur.

 - 24 -